VILBIG CONST. CO. et al. v. WHITHAM.

No. 31398. Sept. 26, 1944.

Rehearing Denied Nov. 14, 1944.

*152 P. 2d 916.*

L. B. Yates, of Altus, and Worsham, Burrow & Worsham and George W. Eddy, all of Dallas, Tex., for plaintiffs in error.

W. G. Roe and Cecil R. Chamberlin, both of Frederick, and Leslie Humphrey and Milburn E. Nutt, both of Wichita Falls, Tex., for defendant in error.

HURST, J. The plaintiffs in error, defendants below, Vilbig Construction Company, a corporation, and J. Lee and E. A. Vilbig, Inc., a corporation, appeal from an order denying a motion to vacate the appointment·of a receiver pendente lite for certain jointly owned properties in possession of said defendants and acquired in connection with a construction project in which the plaintiff and defendants were jointly interested.

The defendants are affiliated corporations, having their offices at Dallas, Tex., and are engaged in the construction business, their principal business being grading and paving highways and streets. The plaintiff,. L. E. Whitham, who resides at Wichita Falls, Tex., is also engaged in the construction business, his principal business being paving highways and streets.

In·July, 1942, the United States Government was contemplating building Tillman Air Field near Frederick, Okla., and the plaintiff and the defendants entered into negotiations with reference to bidding on the contract for laying approximately 704,000 square yards of paving at Tillman Air Field. It was agreed between the plaintiff and the defendants that the defendants should file a bid for the work and the plaintiff would participate in the contract and would assemble the equipment and personnel necessary to perform the work and superintend the carrying out of the contract. Accordingly, the defendants filed a bid which was accepted by the government at a contract price of $1,561,524.

The defendants entered into a contract with Theo Montgomery & Company, a sand and gravel contractor of San Angelo, Tex., to furnish the washed sand and gravel necessary for the project at a contract price of $2 per ton for the gravel and $1.80 per ton for the sand. The aggregate bill for the sand and gravel purchased and used was about $350,000 or $360,000. The plaintiff was interested with Theo Montgomery & Company in furnishing the sand and gravel and was to receive 50 per cent of the profits and stand 50 per cent of the losses incident to furnishing the sand and gravel. There is testimony, not disputed, that the defendants knew of the plaintiff's interest in said contract. And there is testimony that no profit was made on that contract, and the only profit which Theo Montgomery & Company may realize will be its part of the 12c per cubic yard profit on the concrete laid under the principal contract.

The profits on the paving project were to be divided as follows: The first 13c per cubic yard was to go to the defendants; the next 12c per cubic yard was to go to Theo Montgomery & Company under the contract for furnishing the sand and gravel; and the balance of the profit, if any, was to go to the plaintiff. The plaintiff was also to receive a weekly salary of $150 as part compensation for his services in superintending the construction.

The plaintiff testified that during

August and September, 1942, he made all arrangements necessary to start laying the pavement; that he transported some of his own machinery to Frederick and bought and rented other necessary machinery and equipment, arranged for water and the sand and gravel, and assembled the machinery, equipment, personnel and laborers, and was prepared to start laying pavement prior to October 7, 1942.

The defendants had other construction contracts in the vicinity of Tillman Air Field, one at Chattanooga, Okla., near Frederick, a second to do the grading work preparatory to laying the pavement for Tillman Air Field, and a third for paving between barracks near the Air Field and around the gasoline storage tanks. It appears that, due to the delay of defendants in doing the grading work, the plaintiff was unable to start laying concrete until October 7, 1942. He laid concrete a few hours each day from October 7 until October 14, 1942, when rains set in, and due to the rains and conditions of the ground he was unable to lay concrete until October 21st.

The contract between the plaintiff (second party) and the defendants (first parties) contains this clause:

"Second party agrees to oversee and supervise the performance of work governed by this contract, and to furnish all equipment and experienced personnel necessary for its completion, giving the project efficient supervision and attention, the same as if the work had been bid in his own name. It is distinctly understood, however, that first parties retain all the authority and privilege that they would have if first parties were themselves carrying out the construction, furnishing equipment, their own supervision and personnel. Should second party for any reason refuse, neglect, or fail to efficiently prosecute the said work in accordance with the terms of this agreement, first parties in such event may take active charge of the supervision and control of said work, men, materials, tools, equipment, and supplies furnished by second party and complete the work under their own direct control, supervision, and management."

Under the right given by this provision, the defendants, on October 21, 1942, discharged plaintiff as superintendent of the enterprise and assumed the responsibility of carrying out the contract. The plaintiff claims that said action was arbitrary and without just cause or excuse. The letter of discharge reads as follows:

"Since we do not feel that you are prosecuting the work of paving at Frederick in an efficient manner and with the speed which is required to complete the job fast enough, we wish to replace you and make changes we deem necessary. We will retain the personnel organization who wish to remain under the new supervision.

"We are appointing a superintendent of construction as of this date and are writing letters to that effect to Allied Engineering Company and the Army Captain in charge of construction."

Some time during the month of February, 1943, the contract for laying the concrete was practically completed. On February 26, 1943, the plaintiff filed this action asking for relief in three respects, (a) for an accounting in connection with carrying out the paving contract, (b) a restraining order to prevent the removal of the property acquired by and for the joint enterprise, and, (c) the appointment of a receiver pendente lite to take charge of the jointly acquired property.

The plaintiff alleged, and introduced evidence tending to prove, that the defendants had been guilty of bad faith in several respects in an attempt to reduce plaintiff's profit and to prevent the United States Government from re-negotiating the contract and capturing part of the profit; that they had run up the cost of the work by charging to the cost of the project large sums of money that should have been charged against defendants in connection with other and separate contracts of the defendants, in which the plaintiff was

not interested; that the defendants, in disregard of the contract between them and the plaintiff, spent large sums of money in procuring unnecessary equipment from other parties when plaintiff's equipment on the ground was adequate; that if the contract had been carried out properly, a profit of 51c per square yard of · concrete would have been made, thus giving him a direct profit of 26c per cubic yard; and that the defendants were about to remove from this state the machinery and equipment that had been acquired for the joint enterprise, some outright and some under rental contracts with options to purchase, in which the plaintiff had an interest. He asked that a receiver be appointed to take charge of said jointly acquired property along with the funds, accounts receivable, assets, books and records pertaining to said enterprise, with authority to complete the work, collect the balance due on the contract, and re-negotiate the contract with the United States Government, if such re-negotiation should be required.

The court issued a temporary restraining order as prayed, but that question is not now before us. Nor is the accounting feature of the case now before us. A hearing on the application for appointment of the receiver pendente lite was held on March 22, 1943. At that time the accounting feature of the case had not been tried. Much of the evidence introduced bears principally upon the accounting feature of the case, and only incidentally upon the receivership feature. The record contains some 500 pages of evidence. Practically all of the evidence was introduced by the plaintiff. Aside from introducing testimony on one small feature of the case, the defendants introduced no evidence to dispute the evidence offered by the plaintiff.

The appellants argue that the trial court committed an abuse of discretion in appointing the receiver and in refusing to vacate the appointment. They rely largely upon Healey v. Steele, 158 Okla. 194, 13 P. 2d 140, where this court

affirmed a judgment refusing to appoint a receiver, and Eason Oil Co. v. Oklahoma City Petroleum Corporation, 185 Okla. 448, 94 P. 2d 222, where this court reversed a judgment refusing to vacate the appointment of a receiver.

The plaintiff argues that the trial court had authority to appoint the receiver under 12 O. S. 1941 §1551 (1) (6), on the theory that the plaintiff and defendants were joint adventurers in carrying out the paving contract, and that no abuse of discretion is shown. He relies upon Severns v. English, 19 Okla. 567, 101 P. 750; Willard Oil Co. v. Riley, 29 Okla. 19, 115 P. 1103; Hughes v. Garrelts, 35 Okla. 321, 129 P. 43; Moran v. Park, 93 Okla. 201, 220 P. 589; Boynton Gas & Electric Co. v. Mosier, 179 Okla. 232, 65 P. 2d 448; Galer Oil Co. v. Pryor, 182 Okla. 376, 78 P. 2d 281; and Whisman v. Missouri State Life Ins. Co., 186 Okla. 261, 97 P. 2d 1.

1. The relation between the plaintiff and the defendants was that of joint adventurers. Twyford v. Sonken-Galambra Corp., 177 Okla. 486, 60 P. 2d 1050; Madwine et al. v. Osage Supply Co., 177 Okla. 200, 58 P. 2d 131. The relation was fiduciary in character, required the utmost good faith on the part of both parties, and their rights and liabilities as between themselves were similar to or the same as those of partners. Blackstock Oil Co. v. Caston, 184 Okla. 489, 87 P. 2d 1087; 30 Am. Jur. 679, 695.

We have carefully considered the evidence, and are of the opinion that the trial court was reasonably justified in finding that the defendants had not been actuated by that good faith that should obtain between parties occupying a confidential relationship, such as joint adventurers; that the defendants had charged to the paving contract items of expense that should have properly been charged to the grading contract, the job being done by the defendants at Chattanooga, and the other paving contract, in which the plaintiff had no interest; that the defendants had improperly charged against the

joint enterprise repairs on some worn-out Ford trucks belonging to the defendants, and which were used very little on the job; that instead of using the equipment on the ground belonging to the plaintiff, that was usable and adequate, the defendants e x p e n d e d large sums of money in renting equipment to do the work that plaintiff's machinery could have done; that the defendants permitted rental bills to unnecessarily pile up on machinery after the need for it had ceased to exist; that the defendants had indulged in other wasteful practices; and that the defendants were actuated by bad faith in discharging plaintiff as superintendent, and acted arbitrarily and without just cause in so doing. There is evidence that up to that time the work had been carried on at a loss, but the plaintiff's explanation of that fact seems reasonable. He points out that there had been delays, that the laying of the concrete had just begun, and that the work was just getting organized.

As above stated, under the terms of the contract between the plaintiff and the defendants the defendants were entitled to the first 13c profits per square yard of concrete that might be realized, and Theo Montgomery & Company was entitled to the next 12c profit per square yard. Plaintiff was to receive one-half of the profit earned by Theo Montgomery & Company. In addition, he was to receive all the profit over 25c per square yard. Plaintiff was entitled to no profit, directly or indirectly, unless the profit on the enterprise amounted to more than 13c per square yard. In the event the proper officials of the United States thought the profit made was excessive, the United States could re-negotiate the contract and capture the excess profit. The testimony discloses that in that event the per cent of profit of each of the three interested parties (the defendants, Theo Montgomery & Company, and the plaintiff) would be scaled down. It was, therefore, to the interest of the defendants to increase the cost and hold down the profit so as to prevent such re-negotiation. And it was to the interest of the plaintiff to hold down the cost and increase the profit. Thus a situation is presented where the interests of the parties clash, and it will be to the interest of the defendants, but against the interests of plaintiff, to show a small profit on the enterprise. Such an arrangement was conducive to suspicion and misunderstanding between the parties to the enterprise. It placed a temptation before the defendants to manipulate and pad their cost accounts, and the plaintiff claims, and introduced evidence tending to prove, that this is what defendants did. It is important, therefore, that a disinterested party represent the enterprise in connection with a possible re-negotiation of the contract with the United States, and the plaintiff asks that the receiver be authorized to do so.

12 O. S. 1941 §1551 (1) authorizes the appointment of a receiver in an action "between partners or others jointly owning or interested in any property or fund, on the application of the plaintiff, or of any party whose right to or interest in the property or fund, or the proceeds thereof, is p r o b a b l e, and where it is shown that the property or fund is in danger of being lost, removed or materially injured." We are of the opinion that this section applies to joint adventurers, who jointly own or are jointly interested in the property or fund acquired by and for the joint adventure. The plaintiff proved facts giving the trial court jurisdiction, under this section, to exercise a discretion in appointing or refusing to appoint a receiver for the jointly acquired property. True, as argued by the defendants, the rental contracts with options to purchase and apply the rentals on the purchase price were nominally between the owners of the property and the defendants, but the equity in said contracts belonged to the joint adventure, and the defendants did not have the right, as between them and the plaintiff, to waive such right to the loss of the joint adventure.

The defendants i n t i m a t e in their briefs that it was incumbent on plain-

tiff to prove that the defendants were insolvent. However, they cite no authority in support of such view, and we know of none in a case of this kind. While insolvency might be an important element in such a case, it is not a necessary element. High on Receivers (4th Ed.) ch. 1, §18. The statutory provision, above, does not require it.

The fact that clause 2 of the contract, above quoted, gave the defendants the right to take complete control of the work does not exclude the right of the plaintiff to have a receiver appointed where, as here, it is claimed, and the evidence reasonably tends to establish, that the defendants have been guilty of fraud in carrying on the enterprise. 45 Am. Jur. 43, §46; Kaufman v. Catzen, 81 W. Va. 1, 94 S. E. 388, L.R.A. 1918B, 672.

We are of the opinion, and hold, that under the record the trial court had jurisdiction to appoint the receiver and we cannot say that he abused his discretion in doing so. The authorities relied upon by the plaintiff, cited above, support the judgment appealed from, and the authorities relied upon by the defendants are not in conflict with our views herein expressed. See, also, High on Receivers (4th Ed.) ch. 13, §§483, 525.

2. In the order appointing the receiver, the trial court directed the defendants to deliver to the receiver funds on deposit in a Dallas, Tex., bank, held in a special account and belonging to the joint adventure. The defendants argue that this order violates the rule that a receiver appointed in one state has no extraterritorial authority. But, as pointed out by the plaintiff, this order did not purport to give the receiver authority to go into the State of Texas and take possession of the funds; rather, it directed the defendants, who were before the court, to bring the funds into Oklahoma and deliver them to the receiver. This the court had authority to do. 53 C. J. 118, 390. And we cannot say that the court abused its discretion in making the order.

As above pointed out, the defendants introduced very little evidence, and stood upon the record made by the plaintiffs in resisting the appointment of the receiver. And their rights must not be prejudiced in the trial of the accounting feature by what we have said in this opinion.

Affirmed.

CORN, C. J., GIBSON, V. C. J., and RILEY, OSBORN, BAYLESS, WELCH, and DAVISON, JJ., concur.