**FRANKFORT OIL COMPANY, a Division of Carstairs Bros. Distilling Company, Inc., a foreign corporation, Appellant,**

v.

**W. F. SNAKARD, Appellee.**

**No. 6114.**

United States Court of Appeals
Tenth Circuit.

May 18, 1960.

Rehearing Denied July 21, 1960.

---

Mathias F. Correa, New York City (T. Murray Robinson, Leon Shipp, Oklahoma City, Okl., Richard P. Loftus, Sheldon Oliensis, New York City, were with him on the brief), for appellant.

C. J. Watts and John B. Dudley, Jr., Oklahoma City, Okl. (P. D. Erwin, Chandler, Okl., Luther Bohanon, Bohanon & Barefoot, Looney, Watts, Looney & Nichols, and Dudley, Dudley & Dudley, Oklahoma City, Okl., were with them on the brief), for appellee.

Before HUXMAN, PICKETT and BREITENSTEIN, Circuit Judges.

BREITENSTEIN, Circuit Judge.

Appellee-plaintiff Snakard recovered judgment against appellant-defendant Frankfort Oil Company in the amount of $1,493,277 as damages arising from the alleged misconduct of Frankfort in connection with certain transactions between the parties pertaining to Oklahoma oil and gas properties. Jurisdiction is based upon diversity.

The complaint in the court below contained two counts, the first alleging breach of contract and tort and the second charging conspiracy. There were seven defendants, one of whom, Frankfort, asserted a counterclaim against Snakard. The record as filed in this court did not show disposition of all of the claims or as to all of the defendants, and there was no compliance with Rule 54(b), F.R.Civ.P., 28 U.S.C.A., relating to judgments on multiple claims. Because of doubt as to whether the record presented an appealable judgment,[1] we ordered that the parties show cause as to why the appeal should not be dismissed. In response the parties filed a stipulation establishing the disposition or abandonment of all claims except those asserted against Frankfort in the first count of the complaint. This stipulation will be considered as a supplemental record in the case.[2] The issue for determi-

---

1. United States v. Martin, 10 Cir., 267 F. 2d 764, 772.

2. See Rule 75(h), F.R.Civ.P.

nation is the liability of Frankfort under the first count.[3]

Snakard held 13 leases covering 12 tracts of land with a total area of 1,280 acres in Lincoln County, Oklahoma. These leases were for a period of one year with no provision for delay rental and required drilling on or before July 1, 1955, to extend their terms.

On November 11, 1954, Snakard entered into four different but related contracts with Frankfort covering the 1,-280-acre block. In substance, Snakard agreed to assign to Frankfort a one-half interest at $1 per acre and to take care of certain title clearance matters with Frankfort to participate in the cost thereof. Snakard contracted to drill a well, later known as Stanolind No. 1, at an agreed location on the block, to a depth adequate to test the Arbuckle formation. For the drilling of this well Frankfort was to pay Snakard a sum considerably higher than is customarily paid in the area. The purpose of the increased payment was to give Snakard a profit of approximately $20,000 for lease acquisitions. If production was obtained, Frankfort was to be the operator of the block under a joint operating contract.

The Stanolind No. 1 well was drilled in January, 1955, to its maximum depth and secured production in the second Wilcox sand, but because of water trouble and mechanical difficulties it was not completed as a commercial producer. Two other wells, the Erwin No. 1 and the Meador's Estate No. 1, were completed in February and April, 1955, and secured oil production in the second Wilcox sand. In the period March to June, inclusive, 1955, five other wells were drilled.[4] None of these obtained oil production but some were completed as shut-in gas wells.

By the middle of June, 1955, Frankfort had drilled on seven of the tracts. On June 20 Frankfort notified Snakard that it would make no effort to validate the Lee and Simpson leases. Without notice to Frankfort, Snakard, on July 1, 1955, commenced drilling on the Christian and Thomas leases in an attempt to validate them. On the Christian lease he withdrew and did not complete a well. Snakard had financial difficulties and became involved in a lawsuit questioning the continuity of his drilling on the Thomas lease. As a result he lost his interest in the Thomas lease.

Between July 1, 1955, and July, 1958, three commercial oil wells were developed by other parties on the Christian lease, six on the Thomas, and one on the Simpson. The basis for the claim of damages is the loss to Snakard resulting from the lack of validation of the Christian, Thomas, and Simpson leases.

Snakard contends that Frankfort breached its contractual obligations by not drilling on all the leases before the termination thereof. As production was secured, the operating agreement became effective. Therein, Frankfort was made the operator of the jointly-held leases. Under the agreement, if either party desires to drill a well he shall give notice to the other party who shall then have 10 days within which to elect to participate. If the election is to participate, then the "Operator [Frankfort] shall drill such well for the Joint Account and at the joint cost of the parties, and such well shall for all purposes be a jointly-owned well." If the election is not to participate, then "the party desiring to drill may nevertheless drill, complete and equip the well at its own cost and expense." The operating agreement is on a printed form which provides that as to any well not drilled for the Joint Account the participating party shall have entire ownership. This was modified to

---

3. A cross-appeal, No. 6115, Snakard v. Frankfort Oil Company, was dismissed on motion of cross-appellant at the time of oral argument. The issue in the

cross-appeal was the alleged inadequacy of the judgment.

4. The Magnolia No. 1, Clark No. 1, Nitner No. 1, Erwin No. 2, and Amerada-Stanolind.

provide that if Snakard is a non-participating party on any well Frankfort should have a 7/8 working interest and Snakard a 1/8 working interest until Frankfort, out of 3/8 of the working interest, shall have reimbursed itself in a sum equal to 200% of 1/2 of the well cost. Thereafter, Frankfort and Snakard should each have 1/2 of the working interest.

Admittedly, Frankfort was obligated to drill one well.[5] The trial court so held but went on to decide that Frankfort "elected to drill the remaining undeveloped leases and in then failing so to do breached its contractual agreement with plaintiff."

Election to drill is said to result from Frankfort's April 8, 1955, letter to Snakard which read in part: " * * * there are eight drilling commitments remaining in said tract and you are hereby notified so that you may make your election. Further, that Frankfort intends to contract this work on the basis as the previously drilled wells in said tract, or to farm out some of the commitments, whichever is the more practical." If this letter was intended as a notice of desire to drill it was defective as the operating agreement required such notice to state the depth to which the well was to be drilled and the location thereof, and such statements were not made.

Further, it is urged that an election to drill resulted from a so-called caveat filed by Frankfort for record in the office of the county clerk of Lincoln County, Oklahoma, on March 8, 1955. At that time Snakard had not executed all of the lease assignments to which Frankfort was entitled. Previously, the relations between the parties had become strained because Frankfort had refused to pay Snakard the sums due in excess of the actual drilling costs of the Stanolind No. 1 well and also refused to pay certain title correction expenses incurred by Snakard. The Frankfort refusal to pay

resulted from a suit filed in December, 1954, by one Burkett against Snakard. Burkett asserted an ownership of a one-half interest in the leases included in the Frankfort-Snakard transactions.[6]

The caveat refers to the Frankfort-Snakard contracts, describes the land covered by the leases, and states:

"Now, Therefore, the undersigned Frankfort Oil Company * * * does hereby notify the world that it has performed all of the terms of said contract with W. F. Snakard and is entitled to and is the owner of an undivided 7/8ths interest in and to all of the oil and gas leases covering the above described land and any party purchasing same does so at his own risk and peril and with notice of the rights of the undersigned adverse thereto."

Such document did not meet the requirements of the operating agreement as to a notice of intent to drill. As neither it nor the letter of April 8, 1955, was in conformity with the provisions of the operating agreement, it might well be found that Frankfort had never notified Snakard of an intent to develop the undrilled leases. In the absence of a notice of such intent no drilling obligation, beyond that for the first well, rested upon Frankfort. Nevertheless, the trial court found that Frankfort had elected to drill and it may be that such is a reasonable inference to be drawn from the circumstances. The question then is the effect of such election.

The operating agreement provided that when notice of intent to drill was given and the other party chose to participate, the operator "shall drill" and that when the election was not to participate, the party giving the notice "may nevertheless drill." Snakard did not elect to participate. Hence, Frankfort, as the notifying party, had the right to drill but, as the operator, had no obligation to drill.

5. The Stanolind No. 1.

6. After the Burkett suit was filed Frankfort was made a party. The suit was disposed of by a judgment in favor of Snakard on June 30, 1955.

Snakard seeks to avoid this conclusion by asserting that the mentioned provisions relate to the division of expenses and not to the obligation to drill.[7] The position is not well taken as the provisions refer both to the obligation to drill and the responsibility for the expenses.

The last sentence of the paragraph, relating to notice of intent to drill and election to participate or not, reads thus:

"Operations for the drilling of any well under the provisions of this paragraph must be commenced within ninety (90) days after the initial notice is given, and not thereafter."

Counsel for Snakard argue that the use of the word "must" obligates the notifying party to drill whether or not there is participation. The argument is not persuasive. All the provisions of the paragraph have to be considered together and given consistent effect if that is possible.[8] The provisions of the paragraph which preceded the quoted sentence provided that when there was a notice to drill and an election to participate, the operator shall drill. When a notice to drill was followed by an election not to participate the notifying party may nevertheless drill. The distinction is not eliminated by the quoted sentence. The effect of the 90-day provision is to require that if there is participation the well must be commenced within 90 days, and if there is an election not to participate the right to drill must be exercised within 90 days. Such a construction gives effect to all the provisions of the contract. If a different construction were adopted, a

party, by electing not to participate, could force the other party to drill at its own expense. This would be inconsistent with the provision which recognizes only a right, not an obligation, to drill when the election is not to participate. The Oklahoma rule is that " '[t]he intention of the parties must be deduced from the entire agreement, and every provision must be construed so as to be consistent with every other provision if possible, and that construction adopted which gives effect to every part of the contract.' "[9] The application of this rule to the case at bar requires the conclusion that, as a matter of law, the trial court erroneously concluded that Frankfort was obligated to drill each lease and breached its contract by failure to do so.

An additional argument advanced by counsel for Snakard should be mentioned. They contend that the effect of the actions of Frankfort, indicating an intent to drill, placed Snakard in an unfair position and, hence, Frankfort was required to drill. They insist that by refusing to participate Snakard became obligated to pay the drilling costs and could not take action to validate the leases by himself.

Assuming that the notices of intent to drill complied with the operating agreement, as Snakard now contends, Snakard could have obligated Frankfort to drill by electing to participate. He did not do so. Instead, his lawyer replied to Frankfort's April 8 letter by saying that Frankfort had no right to demand an election but was obligated to drill all leases.[10] The position so taken was con-

**7.** The contract language relating to the situation when there is an election to participate reads: "Operator shall drill such well for the Joint Account and at the joint cost of the parties, and such well shall for all purposes be a jointly-owned well." The language applicable when there is no election to participate is: "the party desiring to drill may nevertheless drill, complete and equip the well at its own cost and expense."

**8.** Moyer v. Walker, 10 Cir., 276 F.2d 681.

**9.** Postier v. Postier, Okl., 296 P.2d 138, 139–140. Cf. Phillips Petroleum Co. v. McCormick, 10 Cir., 211 F.2d 361, 364, and Occidental Life Ins. Co. of California v. Marmaduke Corbyn Agency, 10 Cir., 187 F.2d 553, 555.

**10.** The pertinent paragraphs of the letter are these:
"After careful consideration of all agreements between you and Mr. Snakard I am advising him that you have no right to demand any election from [him] but that you are required as the opera-

trary to the November 11, 1954, contracts. It is not now relied on by Snakard.

By the contracts, if Snakard chose not to participate, and Frankfort drilled, Frankfort could reimburse itself, out of production from the well, in an amount equal to double that which Snakard's share of the drilling costs would have been had he elected to participate. If the hole was dry, the entire cost would be borne by Frankfort. Having made such agreements, the parties were bound thereby. There is no claim that the written instruments did not fairly and accurately express the agreements of the parties. We need not consider here what might have been the situation if Snakard had started to drill before the terminal date and Frankfort had objected. Indeed, on two of the leases he did commence drilling operations. Although Snakard may have had faulty legal advice, that fact does not impose on Frankfort a drilling obligation which did not exist under the contracts.

■ The second claim of contract violation is based upon the alleged failure of Frankfort to disclose to Snakard geological and geophysical information pertaining to the oil structures on the leased acreage. The operating agreement provides that the non-operator (Snakard) has the right of access to the leased premises, of inspection of the log, samples and cuttings from wells drilled, and of inspection and audit of the operator's books. Snakard was denied none of these rights. Frankfort had seismographic surveys and other geophysical work done on the properties. There is nothing in the operating agreement which requires Frankfort to furnish reports on such work to Snakard. Unless the failure to divulge such information is tied in with the breach of a fiduciary duty, it is not in violation of the contract.[11]

The third claim of breach of contract relates to the contention that the contract created a joint adventure which in turn created a fiduciary relationship which was breached by Frankfort. The argument in support thereof is beclouded by claims of fraud and slander of title.

■ Fraud is asserted to exist because of misrepresentations by Frankfort that the potential oil field lay to the north and east of the Erwin No. 1 well, whereas information in possession of Frankfort disclosed, and drilling ultimately developed that, the potential field was to the south and east. The brief for Snakard argues that these misrepresentations were made for the purpose of forcing Snakard into a farm-out agreement with Inland Oil Company. The difficulty is that the representations were never believed nor acted upon by Snakard. He consistently maintained that the field lay to the south and east. He refused to enter into the farm-out. Be that as it may, Rule 9(b), F.R.Civ.P., requires that the circumstances constituting fraud must be alleged with particularity.[12] Here, none of the circumstances relied on in the brief to establish fraud are covered by allegations in the

tor to drill and equip all the wells in question and to pay the expenses therefor and to receive reimbursement from the three-eights of the seven-eighths working interest of W. F. Snakard as outlined in your letter of October 12, 1954.

"I am advising Mr. Snakard further that your obligation to drill under the contracts extends to all of the leases, that you do not have the right to refuse to drill upon any of such leases, and that you must drill on each property within the time specified in the leases."

11. Counsel for Snakard make much of the contention that the geological and geophysical surveys were charged in part against Snakard's account. This does not change the situation. There is no claim that Snakard ever paid such charges and, indeed, the charges would be improper. The point urged goes only to the accounting between the parties, not to the right of Snakard to the information.

12. See C. Robert Ingram, Inc. v. Chrysler Corporation, 10 Cir., 256 F.2d 684, 687; Cf. Nolan Bros. Inc., v. United States, 10 Cir., 266 F.2d 143, 145–146.

pleadings.[13] Moreover, there are no findings by the trial court which would sustain a judgment based upon fraud. The circumstances presented to establish fraud merit consideration only insofar as they bear upon a breach of the fiduciary relationship asserted to exist by reason of the contracts.

Snakard contends that Frankfort slandered his title by filing the caveat for record. A lawyer for Frankfort testified that he filed the caveat to protect Frankfort's interests because Snakard had not executed all of the lease assignments to which Frankfort was entitled. The caveat referred to the 1954 contracts, described the leased land, and claimed a ⅞ interest in the leases for Frankfort. The agreements themselves could have been filed. The caveat is no more objectionable than the agreements, except for the claim of a ⅞ interest. By the contracts, as to all wells after the first, Frankfort, in wells in which Snakard elected not to participate, had a ⅞ interest until reimbursed up to 200% of Snakard's share of the drilling costs. Thus, in some instances, Frankfort's interest was ⅞ and in some ½.

The Oklahoma rule is that the principal element in a suit for slander of title is malice.[14] By filing the caveat Frankfort was asserting an interest in the properties under its contracts with Snakard. It had a right to do this unless it was actuated by some wrongful motive which would establish malice.[15] The question of malice is for the trier of the facts.[16] The case at bar was tried to the court and the court made no finding of malice. No question is raised by Snakard in regard to the omission of such finding. It follows that the judgment cannot be sustained on the theory of slander of title.

By their November 11, 1954, contracts the parties entered into a common undertaking involving jointly-owned property and a sharing of the profits. They were engaged in a joint adventure.[17] The relationship so created was fiduciary in character and required the utmost good faith on the part of both parties.[18] The extent and effect of such relationship is determined by the written agreements between the parties defining and delineating the powers and rights of each. In such a situation it is presumed that they delegated all the powers they wished to confer upon each other and withheld all powers or authority not affirmatively delegated.[19] The relationships between them are controlled by the terms of their agreements voluntarily made.[20]

Frankfort is said to have breached its fiduciary duty by withholding geological and geophysical information. There was no contractual obligation on Frankfort to divulge that information. As noted above, the contracts did entitle Snakard to certain information and no claim is asserted that any such information was withheld from him. Snakard's argument in this regard is a plea that we add to the contract a

13. So far as the record before us discloses there was no pre-trial order. This is the type of a case in which great benefits could have been obtainable from an effective pre-trial conference and a definitive pre-trial order.

14. Keiser v. Kile, 166 Okl. 41, 26 P.2d 194, 195. Cf. R. Olsen Oil Co. v. Fidler, 10 Cir., 199 F.2d 868, 872, and Berryman v. Sinclair Prairie Oil Co., 10 Cir., 164 F.2d 734, 736.

15. Ward v. Mid-West & Gulf Co., 97 Okl. 252, 223 P. 170, 171. Cf. 4 Summers, Oil and Gas, § 660, p. 49 (1938).

16. New England Oil & Pipe Line Co. v. Rogers, 154 Okl. 285, 7 P.2d 638, 643.

17. Eagle-Picher Co. v. Mid-Continent Lead & Zinc Co., 10 Cir., 209 F.2d 917, 919; Kasishke v. Baker, 10 Cir., 146 F.2d 113, 115, certiorari denied 325 U.S. 856, 65 S. Ct. 1185, 89 L.Ed. 1976.

18. Vilbig Const. Co. v. Whitham, 194 Okl. 460, 152 P.2d 916, 919; Kaye v. Smitherman, 10 Cir., 225 F.2d 583, 594, certiorari denied 350 U.S. 913, 76 S.Ct. 197; 100 L.Ed. 800.

19. Taylor v. Brindley, 10 Cir., 164 F. 2d 235, 241.

20. Holmes v. Keets, 80 U.S.App.D.C. 327, 153 F.2d 132, 133. Cf. Champlin v. Commissioner of Internal Revenue, 10 Cir., 71 F.2d 23, 27, footnote 3.

provision requiring that Frankfort furnish all geological and geophysical data. We are without power to rewrite the contract for the parties.

The filing of the caveat is asserted as a breach by Frankfort of its fiduciary duty. Frankfort had the right to give notice of its interest in the property. The document filed did not describe that interest with complete accuracy. At the time it was filed the leases were all in effect. The caveat had no bearing on the rights of the parties during the effective period of the November 11, 1954, agreements and of the leases covered thereby. Those rights were controlled by the contracts. As to leases which Frankfort did not validate by drilling, the failure to withdraw the caveat after July 1, 1955, might have resulted in a slander of title but not in a breach of a contractual fiduciary obligation. As we have shown, the claim of slander of title fails because the essential ingredient of malice is lacking.

 A further charge of misconduct in violation of the asserted fiducial duty is that Frankfort misrepresented the facts as to the preferred development of the leased area by informing Snakard that the greatest potential was to the north and east of the Erwin No. 1 well when in fact the data available to Frankfort disclosed that the field lay to the south and east of that well. These misrepresentations were allegedly made to induce Snakard to enter into a farm-out agreement with Inland Oil Company. The claim of falsity is based on the assertion that the geological and geophysical information in possession of Frankfort showed the field to lie to the south. The interpretation of such data involves opinion and judgment. Otherwise the element of uncertainty so characteristic of the oil business would be greatly re-duced in importance. The officials for Frankfort attempted to justify their opinion that the field lay to the north. Snakard was equally insistent that the field lay to the south. The substantiation of Snakard's opinion by later drilling shows that his judgment was the better. The opinions and conclusions of Frankfort did not breach any contractual fiducial duty unless they resulted in some overreaching of Snakard. The record disclosed no such overreaching.

After the completion of the Erwin No. 1 well, the president of Inland offered Snakard $100,000 for his interest in the leases. Snakard refused to sell. Frankfort then proposed the farm-out to Inland. The trial court made no findings as to the details of this proposal and the testimony with relation thereto lacks clarity. There is attached to answers made by Snakard to interrogatories propounded to him an unexecuted agreement wherein Inland would drill two wells without expense to Frankfort and Snakard.[21] Upon the completion of these wells to the designated horizon, Frankfort and Snakard would jointly assign an undivided half interest in a total of 120 acres covered by the Christian and Thomas leases.[22] Whatever the advantages or disadvantages of such an arrangement to Snakard may have been, the matter is of little importance now as Snakard rejected the farm-out. The leases were lost by failure to drill. The obligation to drill depended upon the provisions of the contracts. Such obligation was neither enhanced nor diminished by opinions concerning the area with the greatest potential for development.

Snakard further charges that the conduct of Frankfort was designed to eliminate the interest of Snakard so that

21. One on the 160-acre Christian lease and one on the 160-acre Thomas lease.

22. Of this, 40 acres were in the Christian lease and 80 acres in the Thomas lease. As the area was drilled by others up to July, 1958, there were three producing wells on the Christian lease and six on the Thomas lease. Maps introduced in evidence indicate that two of these wells are possibly on acreage in which a ½ interest would have been assigned to Inland.

Frankfort could toplease.[23] This is answered by the trial court's finding, not now attacked, that: "Defendant [Frankfort] did not later [after July 1, 1955] acquire any interest in the expired Mansfield, Christian, Thomas, Simpson or Lee leases."

Financially, the loss of the Christian, Thomas and Simpson leases was just as great a blow to Frankfort as it was to Snakard. The drilling of the wells to the north and east of the Erwin No. 1 well, when viewed in retrospect, was the exercise of very bad judgment. Frankfort expended its own money in such operations and it thereby validated the Magnolia, Nitner, Clark and Amerada leases. Those operations were in conformity with the November 11, 1954, contracts. If Snakard had been confident in his judgment as to the south leases, he had the right to give notice of intent to drill, and, unless Frankfort had elected to participate and then drilled the wells as the operator, Frankfort would have had no interest in wells so drilled or in the acreage allocable thereto. As it turned out, the leases were not validated and each party lost.[24]

This is not a case of the unjust enrichment of one joint adventurer at the expense of another joint adventurer. Such cases as Blackstock Oil Company v. Caston, 184 Okl. 489, 87 P.2d 1087, and Campbell v. Gooch, 131 Kan. 456, 292 P. 752, do not apply. Those cases considered situations where one joint adventurer, by fraud, inveigled the other joint adventurer to sell at less than actual value. The record now before us shows that bad judgment, bad advice, obstinacy, and misunderstanding joined to produce the loss by both Frankfort and Snakard of leases covering land from which substantial oil production

was later secured by others. We can neither rewrite the contracts for the parties nor protect Snakard from the results of the contracts which he made.[25]

Reversed with directions to enter judgment in favor of defendant Frankfort.

---

23. In the oil and gas vernacular to toplease is to secure a lease on land covered by an existing lease to the end that the toplease will be effective after the expiration of the existing lease and the interest of one or more lessees thereby eliminated. Topleasing has the same invidious characteristics as claim jumping.

24. We are aware that Snakard began drilling on the Thomas in an effort to validate. However, litigation involving the continuity of his operations resulted in a settlement whereby his interest was eliminated.

25. C. Robert Ingram, Inc. v. Chrysler Corporation, supra.