See also, D.C., 344 F.Supp. 754.

In the Matter of **PUBLIC LEASING CORPORATION** (two cases).

**COMMUNITY NATIONAL BANK OF WARR ACRES, Appellant,**

**v.**

**C. C. VICTORY, Receiver of Public Leasing Corporation, Appellee.**

**HOBBS DIVISION OF FRUEHAUF CORPORATION, Appellant,**

**v.**

**C. C. VICTORY, Receiver of Public Leasing Corporation, Appellee.**

No. 73–1324.

United States Court of Appeals, Tenth Circuit.

Argued and Submitted Sept. 14, 1973.

Decided Dec. 14, 1973.

Charles W. Mooney, Jr., Oklahoma City, Okl. (Monty L. Bratcher and Crowe, Dunlevy, Thweatt, Swinford, Johnson & Burdick, Oklahoma City, Okl., on the briefs), for appellant, Fruehauf Corp.

James R. Eagleton, Oklahoma City, Okl. (Don R. Nicholson II and Eagleton, Nicholson & Pate, Oklahoma City, Okl., on the briefs), for appellant, Community Nat. Bank.

Hal D. Leaming, Oklahoma City, Okl. (Smith, Leaming & Swan, Oklahoma City, Okl., on the briefs), for appellee.

Before PHILLIPS, HILL and DOYLE, Circuit Judges.

PHILLIPS, Circuit Judge.

While bearing the same number, appeals from two separate judgments

against two different parties, and presenting different issues, are involved in this case. Such judgments were entered in the United States District Court for the Western District of Oklahoma, in a bankruptcy proceeding entitled, "In the Matter of Public Leasing Corporation,[1] Bankrupt (In Bankruptcy No. 72–286)."

One appeal is from a judgment entered against Hobbs Division of Fruehauf Corporation,[2] and the other is from a judgment asserted to have been entered against Community National Bank of Warr Acres.[3]

There was filed in the Court of Appeals a "Record on Appeal" as Volume I. It embraces a duly authenticated copy of an agreed statement on appeal, entered into between counsel for Fruehauf-Hobbs and counsel for the Receiver of Public Leasing. Such agreed statement was approved by such District Court on May 11, 1973, and filed in the office of the Clerk of such District Court on that day. To it are attached Exhibits "A" to "K", inclusive, and a duly certified copy of the docket entries in such District Court in No. 72–286. Exhibit "K" is a duly authenticated copy of the judgment against Fruehauf-Hobbs, entered in the office of the Clerk of such District Court on April 4, 1973, and from which Fruehauf-Hobbs has appealed.

There was also filed in the Court of Appeals Volume II of the Record on Appeal, which is a duly authenticated transcript of the "Hearing and Decision of the Court in the Matter of the Report of Secured Creditors: Hobbs Division of Fruehauf Trailer Corporation; Community National Bank, * * *." At the close of the hearing, the court stated: "[I]t will be the order and judgment of the Court that the Receiver have and receive judgment as against Hobbs for the amount of $12,400.50, * * * (and) that the Receiver have judgment against

the Bank in the amount * * *." The court did not state the amount, but the parties agreed it was $2,057.64.

The record does not contain a copy of a judgment against the Bank. However, the certified copy of such District Court docket entries recites the following:

"4–4–73 Filed and entered Order and Judgment—THAT judg. is ent'd against Community National Bank and in favor of debtor corp for $2,057.64 * * *

"4–6–73 Filed Fruehauf Corp's and Community Ntl Bk of Warr Acres Noti[c]e of Appeal from final order & judg. ent'd 4–4–73, granting judg. against Community Ntl Bk of Warr Acres in favor of Debtor Corp. for $2,050 w/int at 10% from 3–30–73 * * *"

The record is entirely adequate for the court to determine the issues presented by the appeal of Fruehauf-Hobbs. But the record does not reflect sufficient facts for us to decide all the issues presented by the Bank's appeal, as we will hereinafter show when we consider the Bank's appeal.

On March 2, 1972, Public Leasing filed in the United States District Court for the Western District of Oklahoma its petition for reorganization under Chapter 10 of the Bankruptcy Act, and on that date an order was entered in such District Court approving the petition and appointing a trustee. Thereafter, and prior to August 7, 1972, Fruehauf-Hobbs, the Bank, and other secured creditors each filed a petition for reclamation, seeking the return to it of property described in an agreement or agreements securing an unpaid indebtedness owing from Public Leasing to it. On May 19, 1972, the court entered an order denying all of such petitions for reclamation.

---

1. Hereinafter referred to as Public Leasing.

2. Hereinafter referred to as Fruehauf-Hobbs.

3. Hereinafter referred to as the Bank.

Fruehauf-Hobbs, the Bank, and other secured creditors each filed a motion in the reorganization proceeding that the court adjudge Public Leasing a bankrupt, pursuant to 11 U.S.C.A. § 636(2). On August 3, 1972, there came on "for continued hearing * * * certain petitions for reclamation, * * * and motions to adjudicate the debtor corporation (Public Leasing) a bankrupt, * * * ." From the evidence adduced at such hearing on such petitions and motions, such District Court found Public Leasing was "hopelessly insolvent"; that its reorganization was impossible; and concluded that it should be "adjudged a bankrupt" and that each of the applications for reclamation of Fruehauf-Hobbs, the Bank, and other secured creditors, theretofore denied, should be granted; that the property described in the agreement or agreements securing an indebtedness from Public Leasing should be returned to the petitioner to whom such agreement or agreements ran from Public Leasing and to whom such indebtedness was owing by it; that C. C. Victory should be appointed Receiver of Public Leasing, and that it should be his duty "to gain possession of all equipment and property" of Public Leasing, "including encumbered and unencumbered assets and to distribute to the reclaiming creditors the equipment and property covered by their respective reclamation petitions on file herein, * * * ." The order concluded: "It is therefore ordered, adjudged and decreed that the above findings of the Court * * * be and the same are hereby made the order and judgment of the Court."

On August 18, 1972, the court entered a clarifying order, in pertinent part reading:

"[1] Certain petitioners for reclamation have heretofore, and will be hereafter reclaiming certain equipment and collateral, * * * of a value greater than the balances of the notes and security agreements securing same, * * * . All reclaiming secured creditors should, therefore, account for their sale, disposal, or value of such reclaimed equipment and collateral, listing the amounts of money received from, or value of each separate item of equipment and the note and security agreement balance due on August 7, 1972, and applicable thereto. Such accountings should be filed with the Court Clerk * * * ."

The judgments from which Fruehauf-Hobbs and the Bank appealed were entered after Public Leasing was adjudged a bankrupt.

## I

### The Bank's Appeal

The brief of the Bank states:

That on January 23, 1970, Public Leasing, as maker, executed and delivered to the Bank, as payee, a note for $14,763.60; that on the same date Public Leasing, to secure the payment of such note, entered into a security agreement with the Bank, by which it gave the Bank a lien on "Five (5)—1970 Ford Econoline Vans," the serial numbers of which were set out in such agreement; that such note provided that Public Leasing "further agrees to pay (10%) of principal and twenty-five dollars ($25.00) in addition to the amount due as attorneys fees if collected by an attorney with or without suit"; and that the surety agreement provided: "Expenses of retaking, holding, preparing for sale, selling and the like shall include Bank's reasonable attorneys fees and legal expenses."

Neither the note nor the security agreement nor the substance thereof are set out in the record on appeal filed in this court.

Such brief further states that the Receiver, appointed when Public Leasing was adjudged a bankrupt, took possession of the property described in such agreement, and that pursuant to the order of the District Court, the Bank reclaimed such property and received it from the Receiver; that thereafter the Bank sold such property and made a report and accounting to the court, in ac-

cordance with the court's orders, setting forth the amount received for such property at the sale and the amount due it on the note, and asserted a claim for attorney's fees in the sum of $2,050, as provided for in the note and security agreement; that the excess of the amount received by it from the sale of such property over the amount due on the note and the amount claimed as attorney's fees was $7.64; that it tendered such excess to the Receiver; and that the court denied the claim for attorney's fees and awarded the Receiver judgment against the Bank for $2,057.64.

The only question presented by the Bank's appeal is whether the Bank was entitled to deduct attorney's fees from the amount received by it at the sale.

■ Counsel for the Receiver in his brief states: "Appellee-Receiver takes no issue with the Bank's statement that attorney fees were provided in the notes and security agreements, nor that the amount of $2,050.00 is reasonable, if allowable." But, counsel for the Receiver asserts that while a creditor has a provable claim for legal services rendered prior to the filing of the petition in bankruptcy, he has not for those rendered thereafter, and cites in support of that contention the decision of this court in American National Bank v. Bartlett, 10 Cir., 40 F.2d 21. We agree that such is the established law of this circuit. But, counsel for the Receiver also contends that an application of that rule in the instant case precludes the allowance of attorney's fees for legal services rendered after the filing of the petition for reorganization of Public Leasing under Chapter 10 of the Bankruptcy Act. With that contention we disagree.

■ Bankruptcy contemplates the taking of possession by the trustee of the property of the bankrupt actually or constructively in his possession at the time of the filing of the petition in bankruptcy; the distribution of the proceeds received from such property, ratably, among the creditors of the bankrupt whose claims have been filed and allowed; and the discharge of the bankrupt from liability for the unpaid balance of such claims.

■ Reorganization contemplates the very opposite. Reorganization of a corporation under Chapter 10 contemplates the preparation of a plan of reorganization by the trustee, the submission thereof to the court, and after a hearing, the determination of the feasibility of such plan by the court and the approval thereof by the court if it finds such plan is feasible and proper. And if the plan is then accepted by the stockholders and creditors, as provided in 11 U.S.C.A. § 579, the court, after a hearing, may confirm the plan. Such plan, to be feasible, must eliminate or reduce the rights of stockholders, and reduce or extend the claims of the creditors to a degree that will place the corporation in a financial position where it can continue in business and meet the claims of its creditors.

■ We hold that a proceeding to reorganize a corporation under Chapter 10 is not a "bankruptcy," though such chapter was enacted as an amendment to the Bankruptcy Act and creates and regulates the remedy of reorganization. See Lowden v. Northwestern National Bank & Trust Co., 298 U.S. 160, 165, 56 S.Ct. 696, 698, 80 L.Ed. 1114, 1116.

11 U.S.C.A. § 1, in part provides:

"The words and phrases used in this title and in proceedings pursuant hereto shall, unless the same be inconsistent with the context, be construed as follows:

\*    \*    \*    \*    \*    \*

"(12) 'Date of adjudication' shall mean the date of the filing of any petition which operates as an adjudication, *or the date of entry of a decree of adjudication* \* \* \*" (Italics ours.)

11 U.S.C.A. § 41(g), in part provides:

"Upon the filing of a voluntary petition, \* \* \* the judge shall hear the petition and make the adjudication or dismiss the petition. \* \* \*"

11 U.S.C.A. § 530, prescribing what the petition of a corporation for reor-

ganization under Chapter 10 shall state, in part reads:

"Every petition shall state—

\*   \*   \*   \*   \*   \*

"(7) the specific facts showing the need for relief under this chapter and why adequate relief cannot be obtained under chapter 11 of this title; and

"(8) the desire of the petitioner or petitioners that a plan be effected."

The petition for reorganization in the instant case was filed under 11 U.S.C.A. § 528.

11 U.S.C.A. § 636, in part provides:

"If no plan is proposed within the time fixed or extended by the judge, or if no plan proposed is approved by the judge and no further time is granted for the proposal of a plan, or if no plan approved by the judge is accepted within the time fixed or extended by the judge, or if confirmation of the plan is refused, or if a confirmed plan is not consummated, the judge shall—

\*   \*   \*   \*   \*   \*

"(2) where the petition was filed under section 528 of this title, after hearing upon notice to the debtor, stockholders, creditors, indenture trustees, and such other persons as the judge may designate, enter an order either adjudging the debtor a bankrupt and directing that bankruptcy be proceeded with pursuant to the provisions of this title, or dismissing the proceeding under this chapter, as in the opinion of the judge may be in the interests of the creditors and stockholders."

■ The reorganization petition was not a petition in bankruptcy in the ordinary sense of that term. It did not contemplate collection and distribution of the assets of Public Leasing ratably to creditors and the discharge of Public Leasing from its debts. On the contrary, it contemplated an arrangement by which Public Leasing could continue in business and pay its debts to the extent and in the manner provided by the confirmed plan.

■ The adjudging of the debtor to be bankrupt was not pursuant to the petition for reorganization, but was pursuant to the provisions of 11 U.S.C.A. § 636(2), and the "date of the adjudication" falls within the second clause of 11 U.S.C.A. § 1(12) quoted supra, viz; "the date of entry of a decree of adjudication."

Here, the Bank, in its efforts to reclaim from the trustee the property in his possession which was covered by its security agreement, properly and necessarily employed attorneys and became liable to pay them reasonable fees for their services.

We hold that the Bank was entitled to retain a reasonable amount for the services rendered by its attorneys prior to the adjudication in bankruptcy. Since we cannot determine that amount on the record before us, the judgment appealed from is REVERSED, and the District Court is directed to determine that amount and allow it as a deduction from $2,057.64, which the Bank received from the sale of the property in excess of the amount of principal and accrued interest on the note, and render judgment against the Bank accordingly.

It is so ordered.

## II

### *Fruehauf-Hobbs' Appeal*

From time to time Fruehauf-Hobbs sold to Public Leasing and others trailers and other trucking equipment, and took security agreements from the purchasers to secure the balance owing on such trailers and equipment and all other indebtedness owing by the purchasers to Fruehauf-Hobbs.

Fruehauf-Hobbs held such security agreements on all of the property reclaimed by it from the trustee of Public Leasing, and delivered to Fruehauf-Hobbs by the Receiver under the clarifying order of August 18, 1972. Each of such security agreements specifically de-

scribed the property purchased, stated the total unpaid balance of the purchase price, and stated that such balance should be paid in monthly installments in the amount stipulated in such security agreement.

In such security agreements, Fruehauf-Hobbs is referred to as the "Seller" and the purchaser as the "Buyer."

Each of such agreements provided:

"Buyer agrees that 'Seller' retains title to equipment purchased hereunder and is granted a security interest in any additional security collateral described herein, as well as any accessions or accessories added thereto, all of which is hereafter referred to as the collateral, as security for the payment of said time balance, and also for any and all liabilities of Buyer to 'Seller' now existing or hereafter incurred."

The security agreements each further provided:

"Buyer shall be in default upon the happening of any one or more of the following events.

"1. Default in the performance of any obligation secured hereby.

    \*    \*    \*    \*    \*    \*

"4. \* \* \* insolvency, appointment of a receiver or commencement of any proceeding under any bankruptcy laws of, by, or against Buyer any partner or principal shareholder of Buyer,

    \*  \*  \*

"Upon the occurrence of any event of default, 'Seller' may declare any and all obligations secured hereby to be immediately due and payable and shall have all of the remedies of a secured party under the Uniform Commercial Code. \* \* \*.

    \*    \*    \*    \*    \*    \*

"2. \* \* \* This instrument and any such Sales Order constitute the entire agreement between the parties with respect to this sale, and in the event of any conflict, this instrument shall control.

    \*    \*    \*    \*    \*    \*

"4. It is agreed that the law applicable to this agreement is the law of the State shown as 'Sellers' local address set forth above."

Each of the security agreements here involved set forth Oklahoma City as the "local address" of the seller.

In accordance with the clarifying order of August 18, 1972, the Receiver delivered to Fruehauf-Hobbs the trailers and other equipment covered by its reclamation filed in the reorganization proceeding. On January 11, 1973, in accordance with such order of August 18, 1972, Fruehauf-Hobbs filed a detailed report and accounting of the sale, disposal or value of the property reclaimed by it and listed therein the amounts of money received from the sale of, or value of each separate item of such reclaimed property, and the note and security agreement balance due thereon on August 7, 1972. In its report and accounting, Fruehauf-Hobbs, in accordance with the order of August 18, 1972, also showed the amount it received from the reclaimed property sold by it, and the value of the reclaimed property which it had not sold. The report and accounting stated the equity, if any, which Fruehauf-Hobbs asserted Public Leasing had in each of the items of property reclaimed.

The Receiver filed objections to the report, in which he asserted that the amount Fruehauf-Hobbs received for the reclaimed property which it sold plus the value of the reclaimed property, which it had not sold but retained, exceeded the amount owing by Public Leasing to Fruehauf-Hobbs on the purchase of such property by $12,400.50. In his testimony, he stated he raised no question with respect to the property sold by Fruehauf-Hobbs, but he did question the value placed by Fruehauf-Hobbs on the property it did not sell. He stated his valuations on the unsold property were based on what Fruehauf-Hobbs received for like reclaimed property which it sold, as set forth in its report, and what American Trailers received for like property which it sold, as set forth in the report filed

by American Trailers, and that his valuation reflected an equity of Public Leasing in such unsold property of $12,400.50, and the amount of such equity Fruehauf-Hobbs reflected in its report was $7,307.63.

In its report to the court, in accordance with the orders of August 7 and August 18, 1972, Fruehauf-Hobbs stated it sustained a loss on all the vehicles it reclaimed, listed on Exhibit "A", and a loss on all the vehicles it reclaimed as shown on Exhibit "B", attached to such report.

On March 30, 1973, a hearing was held on such report and the Receiver's objections thereto; and on April 4, 1972, an order was entered awarding "the debtor corporation and its representatives" a judgment against Fruehauf-Hobbs for $12,400.50.

In its brief Fruehauf-Hobbs asserts that by virtue of the cross-collateralization clause, set out, supra, each of the security agreements given by Public Leasing to Fruehauf-Hobbs secured not only the unpaid purchase price of the trailer described in such security agreement, but also any other indebtedness owing by Public Leasing to Fruehauf-Hobbs. Fruehauf-Hobbs. must sustain that contention in order to show the loss it asserted in its report.

Fruehauf-Hobbs also asserts that because of the insolvency and the adjudication of bankruptcy of Public Leasing, it had the right to declare all the indebtedness secured by the several security agreements from Public Leasing due and payable, and that the amount of such other indebtedness secured by such security agreements more than equaled the excess equity claimed by the Receiver.

Fruehauf-Hobbs further asserts that the Receiver's report and analysis of the report and accounting filed by Fruehauf-Hobbs shows that the latest security agreement in which he found the value of the vehicle sold exceeded the amount owing on the purchase price, and therefore an equity in favor of Public Leasing, was dated December 6, 1969,

and that the value of every vehicle sold after that date was less than the unpaid purchase price, and that such deficits were greater than the aggregate of the equities found by the Receiver in the security agreements entered into before December 6, 1969.

The Receiver further testified that prior to March 2, 1972, when Public Leasing wanted to sell a trailer or other piece of equipment purchased by it from Fruehauf-Hobbs, and on which it had given a security agreement to secure the unpaid balance of the purchase price, it paid off such unpaid balance, and that Fruehauf-Hobbs never at any time after such payment asserted any claim that such trailer or other piece of equipment, by reason of the cross-collateralization clause in the security agreement, remained subject to a lien for any other indebtedness owed by Public Leasing to Fruehauf-Hobbs.

The Receiver further testified that after March 2, 1972, and during the reorganization proceedings, the trustee had in his possession trucks on which International Harvester Company held a "mortgage" to secure to it the unpaid purchase price, and bodies on such trucks on which Fruehauf-Hobbs held a "mortgage" to secure to it the unpaid purchase price; that the trustee sold such trucks and bodies, paid the balance of the unpaid purchase price to International Harvester and to Fruehauf-Hobbs, and retained the balance he received from the sale of such trucks and bodies; and that Fruehauf-Hobbs never asserted any claims on such balance.

He further testified that there came into his possession as such Receiver 11 trailers purchased by Public Leasing from Fruehauf-Hobbs, and for which Public Leasing had paid Fruehauf-Hobbs the unpaid balance of the purchase price; that he sold such 11 trucks as unencumbered property at auction; and that Fruehauf-Hobbs, knowing he was going to sell such trucks as unencumbered property, made no objection thereto.

John R. Jones, called as a witness by Fruehauf-Hobbs at the hearing on its report and accounting, testified to the following:

He is the Controller and Finance Manager of the Hobbs Division of Fruehauf; that the value of all the vehicles reclaimed was arrived at by actual appraisals; that those over which there was a controversy as to value had been reconditioned; and that thereafter all of them were listed at the estimated selling price. After being reconditioned, they were put up for sale, and none of them had been sold for as much as the asking price.

Jones further testified that a separate security agreement was entered into for each vehicle sold; and that before the petition for reorganization was filed, when Public Leasing wanted to sell a vehicle, it paid the balance due on the purchase price thereof, and thereupon Fruehauf-Hobbs released such vehicle from the lien of the security agreement.

The court held that the mutual dealings between Fruehauf-Hobbs and Public Leasing prior to March 2, 1972 (and of Fruehauf-Hobbs and the trustees and Receiver after that date) indicated that each security agreement be treated as separate from and independent of the others, and as securing only the balance of the purchase price of the property described therein, and not as securing an unpaid balance of the purchase price of property described in any other security agreement; and the court rendered judgment against Fruehauf-Hobbs for $12,400.50, with interest at 10 per cent per annum from March 30, 1973.

Fruehauf-Hobbs and Public Leasing agreed in each security agreement "that the law applicable to this agreement is the law of the State shown" as the seller's local address set forth in such agreement. In all of the security agreements herein involved, that address was Oklahoma City, Oklahoma. Hence, the applicable law is the law of Oklahoma.

The Uniform Commercial Code was adopted in Oklahoma on July 21, 1961, and became effective on January 1, 1963, as provided in 12A O.S.1971 §§ 1–101 to 10–104, inclusive.

It provides:

"Obligations covered by a security agreement may include future advances or other value whether or not the advances or value are given pursuant to commitment." 12A O.S.1971 § 9–204(5).

It also provides:

"Except as otherwise provided by this Act a security agreement is effective according to its terms between the parties, against purchasers of the collateral and against creditors. * * * " 12A O.S.1971 § 9–201.

Although the Supreme Court of Oklahoma has not directly passed on the validity of a cross-collateralization clause under § 9–204(5), supra, the courts of states which have adopted the Uniform Commercial Code, and which have passed on such question, have uniformly sustained the validity of such a provision.[4]

Moreover, counsel for the Receiver in his brief concedes that the validity of cross-collateralization clauses has been generally sustained by the courts.

The cross-collateralization clause in the security agreements was clear and free from ambiguity, its meaning was free from doubt, and it was not contradictory of or in conflict with any other provisions of such agreements. Hence, there was no reason to resort to parol evidence to ascertain what the parties intended thereby.

■■ The decisions of the Oklahoma Supreme Court are in accord with the general rule that where the terms of a contract are clear and unambiguous there is no reason to resort to rules of

4. In Re Riss Tanning Corporation, 2 Cir., 468 F.2d 1211, 1213; Kenneally v. Standard Electronics Corporation, 8 Cir., 364 F.2d 642, 646; State Finance Co. v. Laugharn, 9 Cir., 113 F.2d 59, 60–61; See also South County Sand & Gravel Co. v. Bituminous Pavers Co., 106 R.I. 178, 256 A.2d 514, 517, 518.

construction. In National Fire Ins. Co. of Hartford v. McCoy, 205 Okl. 511, 239 P.2d 428, the court, in Syllabus 2, which is the law of the case in Oklahoma, said:

"A contract in writing, if its terms are free from doubt or ambiguity, must be permitted to speak for itself, and cannot by the courts, at the instance of one of the parties, be altered or contradicted by parol evidence, * * *." 5

Moreover, here the construction placed on the contract by the court entirely wiped out a clear and unambiguous provision of the security agreement.

In Frankfort Oil Company v. Snakard, 10 Cir., 279 F.2d 436, 441, this court held that it was the law of Oklahoma that the intention of the parties to a contract·must be deduced from the entire contract, and if possible that construction should be adopted which will give effect to every provision of the contract.

■ Moreover, we are of the opinion that the evidence as to the conduct of the parties, particularly the releasing by Fruehauf-Hobbs of the security agreement on certain vehicles which Public Leasing desired to sell, did not justify the conclusion that Fruehauf-Hobbs mutually agreed with Public Leasing that the cross-collateralization clause should be eliminated from all such agreements with Public Leasing and given no force or effect.

It may well be that Fruehauf-Hobbs, when it released the lien of the security agreements on vehicles which Public Leasing desired to sell on receipt of payment of the balance of the purchase price owing thereon, felt all of its other indebtedness from Public Leasing was adequately secured, and it could well accommodate a valuable customer. But it does not follow that it would do so as to all other security agreements, especially in cases when, as here, there were other vehicles, sold to Public Leasing by Fruehauf-Hobbs, where the value of the vehicles was insufficient to secure the unpaid purchase price of the vehicles.

Accordingly, we hold that the cross-collateralization clause of the security agreements was valid; that it was clear and unambiguous; that it did not conflict with or contradict the other provisions of such agreements, which were also clear and free from doubt or ambiguity; and that the court erred in eliminating the cross-collateralization clause from such agreements.

The judgment of the Receiver against Fruehauf-Hobbs is reversed, and the cause is remanded to the· District Court with instructions to hold a further hearing and, giving full effect to the cross-collateralization clause in the security agreements given by Public Leasing to Fruehauf-Hobbs, except such security agreements that were expressly released by Fruehauf-Hobbs, determine the amount of any liability of Fruehauf-Hobbs to the Receiver on account of the property reclaimed by it from the trustee.

---

5. To the same effect see Garrett v. Pollock, Okl., 299 P.2d 516, 519, and Coker v. Hudspeth, Okl., 308 P.2d 291, 294.