Kay **HUNT**, Appellant,

v.

Vernon J. **PICK**, Appellee.

Andrew **HUNT**, Appellant,

v.

Vernon J. **PICK**, Appellee.

Nos. 5395, 5396.

United States Court of Appeals
Tenth Circuit.

Jan. 16, 1957.

Horace J. Knowlton, Salt Lake City, Utah, and Stanley W. Johnson, Washington, D. C. (Albert V. Witham, Denver, Colo., was with them on the brief), for appellants.

Donald S. Stubbs, Denver, Colo. (Groves, Dufford & Turner, Grand Junction, Colo., Lewis, Grant & Davis, Denver, Colo., Donald J. Dufford, Grand Junction, Colo., Donald W. Hoagland, Denver, Colo., and Russell B. Pace, Jr., Englewood, Colo., were with him on the brief), for appellee.

Before PHILLIPS, MURRAH, and LEWIS, Circuit Judges.

LEWIS, Circuit Judge.

A summary judgment was granted in favor of defendant-appellee, Vernon J. Pick, dismissing with prejudice the complaints of the plaintiffs-appellants, Andrew Hunt and Kay Hunt [1] by the United States District Court for the District of Colorado. The two cases were consolidated for trial and appeal since both complaints demanded an accounting for profits realized through the operation and sale of uranium claims located in the Muddy River area in Southeastern Utah, and were based upon the same oral partnership agreement which, it is alleged, the three men entered at about the time the claims were located in 1952.

The complaints, filed June 7, 1955, as later amended by stipulation, declared that on or about the 3rd day of July, 1952, the defendant and two plaintiffs entered into an oral contract whereby it was agreed that they would jointly stake out, file, explore, improve and operate certain unpatented mining claims known as Delta 1, 2, 3, 4, 5, 6 and 7; that the parties were to participate in the partnership on the basis of 30% for plaintiff Andrew Hunt, 20% for plaintiff Kay Hunt, and 50% for defendant Vernon Pick; that the plaintiffs have performed work upon the claims according to the agreement but that defendant has neglected and refused to render an accounting on profits arising out of the operation or out of the sale of the property in 1954. Defendant denied the formation of the partnership and answered that plaintiffs had

been paid as employees for their labor on the claims; that they had, for a consideration, executed instruments which demonstrated accord and satisfaction; that the asserted claims of plaintiffs were barred by the Utah and Colorado statutes of frauds; [2] and finally that the doctrines of laches and equitable estoppel were applicable. The motion for summary judgment was based on similar grounds and was supported by defendant's affidavits, depositions of plaintiffs taken pursuant to discovery procedures, and several documents, including a memorandum purportedly signed by Andrew Hunt disclaiming any interest or ownership in the Delta claims. Affidavits in resistance to the motion set forth that payments received by plaintiffs were in accord with the partnership agreement; that the instruments of disclaimer and accord were forged and fraudulent; and denied the conclusion that the defenses of laches, estoppel and the statute of frauds were applicable summarily or at all. The trial court granted a summary judgment adverse to plaintiffs without specifying its legal basis.

The power of the court to grant summary judgment is limited to those instances where no genuine issue of fact exists which is determinative of duty or right. Broderick Wood Products Co. v. U. S., 10 Cir., 195 F.2d 433; Avrick v. Rockmont Envelope Co., 10 Cir., 155 F.2d 568; Dulansky v. Iowa Illinois Gas & Electric Co., 8 Cir., 191 F.2d 881; Schreffler v. Bowles, 10 Cir., 153 F.2d 1. The power to summarily grant or refuse relief is admittedly drastic, never proper where an issue turns on credibility, and is intended to be and is proper only in those instances where a trial would be useless. However, where multiple claims are made or multiple defenses are asserted the remedy is proper if no genuine issue of fact exists relative to any one claim or defense that is determinative of part or all of the issues. The existence of disputed facts on other issues does

1. The parties will hereinafter be designated as they appeared in the lower court.

2. Utah Code Annotated 1953, 25–5–1, 25–5–3; Colorado Revised Statutes 1953, 59–1–8.

not defeat the proper application of summary disposition to those issues where no such dispute exists.

It is immediately apparent in the instant case that a controversy exists involving disputed facts decisive of the existence or non-existence of a partnership between the parties; that the controversy extends to a claim and denial of factual matters affecting a termination of all or any legal relationship between the parties; that the possible and proper application of the pleaded statutes of frauds cannot be determined absent the truth relative to the words and conduct of the parties at the inception of their association. These claims and denials involve genuine factual disputes and cannot be tried by affidavit and counter-affidavit. We presume therefore that the trial court based its judgment of dismissal upon the sole remaining question of laches.

Since the doctrine of laches is a creature of equity and but distantly, if at all, related to the statutory limitation of time for bringing an action at law, each situation must be examined in the light of its own particular facts. Patterson v. Hewitt, 195 U.S. 309, 25 S.Ct. 35, 49 L.Ed. 214. The essential question to be determined is whether the assertion of the plaintiffs' cause has, through lapse of time considered with the circumstances and nature of the alleged cause, become unconscionable and, if allowed to prevail, would constitute an injustice to defendants. To this end we examine the claim of the plaintiffs Hunt.

According to the testimony offered by the two plaintiffs in discovery depositions, the first overtures toward a business agreement were made on about June 19, 1952, when Vernon Pick announced his discovery and discussed his location on the Muddy River with Andrew Hunt at Hunt's home. Hunt was not immediately receptive to Pick's suggestions and no final agreement was reached. On June 22, Pick sent a message via Hunt's son for Andrew to come at once as he needed his help. During the discussion on that date, Hunt said that he wanted it understood that he had the right to locate around Pick's claims.

On June 24, Pick and Andrew Hunt went to the location; Hunt saw Pick's discovery monument there at that time and recommended that four additional claims be staked surrounding the existing one. Pick, who was ill, suggested that Hunt get another man, put in the discovery monuments, and guard the claims.

On June 27, Hunt and one Ekker went to the claims and wrote location notices in the names of Hunt and Pick. Copies of the location notices in Hunt's possession were later destroyed. These notices were never recorded and eventually, upon Pick's suggestion, changed to Pick's name only.

On July 1, the Black Jack claims, approximately three miles from the Deltas and across the river, were located by Hunt. The Bluebird claims were located also by him approximately one month later directly across the river from the Deltas. Pick did not share in the work or ownership of either of these two claims, although Hunt testified that he offered him an interest in them.

On July 3, Pick returned to the Delta claims with the plaintiff Kay Hunt, who is a son of Andrew. It was at that time, so says Hunt, that the partnership agreement was entered, providing for an interest in Pick of 50%, Andrew Hunt 30%, and Kay Hunt 20%. Other terms of the agreement are not clearly shown, but during the following three months each of the three men contributed labor and Pick paid the expenses. Kay Hunt had a bulldozer which was used for building roads into the claims and Andrew Hunt apparently acted as straw boss over men who were later hired.

Shipments out of the mine began the following month, August, 1952. By September 15, Andrew Hunt stated, quite a lot of ore had been shipped, but he could only guess at the value of the mine at that time. Since Pick was doing all of the accounting and making all business arrangements, Hunt knew nothing of the receipts or expenses.

On September 25, Pick and Hunt quarreled over Hunt's manner of directing the men in the mine. Hunt told Pick of his concern over the fact that he had no writing showing his interest in the claims and that he had not seen any of the shipping receipts. Pick assured him that these interests would be protected. However, it was agreed by the two of them that Hunt should take some time off to take care of his sick wife.

Andrew Hunt did no further work at the mine after September 25, 1952. Kay Hunt left the Delta claims about the middle of September, but returned about September 25 and worked five days with his bulldozer upon a road which led into the Black Jack and Bluebird claims as well as the Deltas.

Both men submitted bills which included $15 per day for working time; rentals of horses and saddles, food for horses; mileage at 20¢ per mile on pickup truck; rental of bulldozer at $7.00 per hour; and blasting materials. These bills were paid by Vernon Pick.

Pick continued to operate the mine alone from September 25, 1952, to sometime in 1954, when he sold it for $9,000,000.[3]

The present suit for an accounting was filed by the plaintiffs on June 7, 1955.

■ Nowhere in the law has the doctrine of laches been more strictly applied, and properly so, than in controversies involving mining claims. Human experience dictates the necessity and justness of such application as a reflection of right in that field where legal formality is the exception and effort and action are the prime bases and criteria of understanding and truth. Prospectors are neither lawyers nor engineers nor does the law expect them to be. They are not held to strict and technical compliance with the niceties of procedural law pertaining to discovery, location and other statutory requirements for it is essential that reward be preserved to him who searches and finds, and not handed to him who, armed with technical knowledge, listens and waits. And so, in applying the doctrine of laches, the emphasis is less upon the passage of time and more upon the effort expended and the risk taken for here, too, the reward should be preserved to him, who having discovered, proceeds to develop. As was said in Ruthrauff v. Silver King Western Min. & Mill. Co., 95 Utah 279, 80 P.2d 338, 344:

> "It must be borne in mind that rights under a mining location are mere shadow rights, rights of possession, devoid of title, dependent upon continued outlays in money or labor until the paramount title of the government is earned upon the statutory terms. If the locator slackens his efforts his rights will vanish upon entry and location by another. He cannot ride through upon the efforts and sacrifices of another or others. If the latter earn the title, it is theirs, not his."

And in Patterson v. Hewitt, supra [195 U.S. 309, 25 S.Ct. 38]:

> " * * * If appellants had expected a share in this property they should either have brought a bill promptly to enforce their rights, or at least contributed their proportionate share to the subsequent work and labor, and the expenses then incurred. To award them now a deed to their original interest in the property would be grossly unjust to the defendants, through whose exertions the value of the property was discovered and the mine put upon a paying basis. While it is true the court might impose upon the appellants the payment of their proportionate share of labor and expenses as a condition of relief, it could not compensate the defendants for the risk assumed by them that their exertions would come to nought. There is no class of property more subject to sudden and violent fluctuations of value than mining lands. A location which to-day may have no

---

3. The Hunts' own mines were also fantastically valuable. The Bluebird claims were sold for a contract price of $1,000,000.

salable value may in a month become worth its millions. * * * Under such circumstances, persons having claims to such property are bound to the utmost diligence in enforcing them, and there is no class of cases in which the doctrine of laches has been more relentlessly enforced."

To the same effect, see Curtis v. Lakin, 8 Cir., 94 F. 251; O'Hanlon v. Ruby Gulch Mining Co., 64 Mont. 318, 209 P. 1062; Pfister v. Cow Gulch Oil Co., 10 Cir., 189 F.2d 311; Taylor v. Salt Creek Consolidated Oil Co., 8 Cir., 285 F. 532.

Although plaintiffs acknowledge that their admitted silence was broken only after publicity had indicated the spectacular success of the Delta claims they contended they were misled into believing Pick would account to them for their alleged share by their trust in him and his words of assurance. Yet their own testimony indicates that they were concerned about the fact that they were not informed of production results at the time they were working in the mine. After receiving an agreed amount for their labor and equipment, they risked nothing further and made no demand upon Pick until this suit was filed. They were working their own claims, the Bluebird, directly across the river and knew that the Deltas were shipping ore and yet made no claim to it. It is apparent that the plaintiffs did not prosecute with diligence either the duties imposed upon them by the alleged partnership agreement or their claim to benefits under it.

■■ We are of the opinion that the instant case presents a classic situation for the application of the bar of laches and that the trial court properly summarily disposed of plaintiffs' claims. Under such circumstances a person may not withhold his claim awaiting the outcome of a doubtful enterprise, and, after assurance of financial success favorable to the claimant, for the first time assert his interest, especially where he has thus avoided the risks of the enterprise. Pfister v. Cow Gulch Oil Co., supra.

The summary judgment is accordingly Affirmed.