282 F.2d 787
 HOMESTAKE MINING COMPANY and Homestake-New Mexico Partners, Appellants,
v.
MID-CONTINENT EXPLORATION COMPANY, Appellee.
RIO DE ORO URANIUM MINES, INC., Appellant,
v.
HOMESTAKE MINING COMPANY, Appellee.
J. H. WHITNEY & CO., White, Weld & Co., and San Jacinto Petroleum Corp., Appellants,
v.
HOMESTAKE MINING COMPANY, Appellee.
UNITED WESTERN MINERALS COMPANY, Appellant,
v.
RIO DE ORO URANIUM MINES, INC., J. H. Whitney & Co., White, Weld & Co., San Jacinto Petroleum Corp., Clyde Osborn, and Homestake Mining Company, Appellees.
HOMESTAKE MINING COMPANY, Appellant,
v.
RIO DE ORO URANIUM MINES, INC., United Western Minerals Company, J. H. Whitney & Co., White, Weld & Co., San Jacinto Petroleum Corp., and Clyde Osborn, Appellees.
 No. 6203.
 Nos. 6244-6247.
 United States Court of Appeals Tenth Circuit.
 September 7, 1960.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Harry L. Bigbee, Santa Fe, N. M. (Donnan Stephenson, Harl D. Byrd, Santiago E. Campos, Santa Fe, N. M., Kenneth C. Kellar, Robert E. Driscoll, Jr., Lead, S. D., Herman Phleger and Alvin J. Rockwell, San Francisco, Cal., were with him on the brief), for Homestake Mining Co. and Homestake-New Mexico Partners.
 Chester C. Davis, New York City (Modrall, Seymour, Sperling, Roehl & Harris, Albuquerque, N. M., Simpson, Thacher & Bartlett, New York City, and J. R. Modrall, Albuquerque, N. M., Richard Hawkins, Maxwell E. Cox and Rogers M. Doering, New York City, of counsel, were with him on the brief), for Mid-Continent Exploration Co.
 Chester C. Davis, New York City (Iden & Johnson, Albuquerque, N. M., and Simpson, Thacher & Bartlett, New York City, and James T. Paulantis, Albuquerque, N. M., Richard Hawkins, Maxwell E. Cox and Rogers M. Doering, New York City, of counsel, were with him on the brief), for Rio De Oro Uranium Mines, Inc.
 Robert G. Zeller, New York City (C. Kenneth Clark, Jr., New York City, was with him on the brief), for J. H. Whitney & Co., White, Weld & Co., and San Jacinto Petroleum Corp.
 John D. Robb, Albuquerque, N. M. (Rodey, Dickason, Sloan, Akin & Robb, Albuquerque, N. M., were with him on the brief), for United Western Minerals Co.
 No appearance for Clyde Osborn.
 Before MURRAH, Chief Judge, and PHILLIPS and BREITENSTEIN, Circuit Judges.
 BREITENSTEIN, Circuit Judge.
 
 
 1
 These consolidated appeals present a variety of issues dealing with the respective rights of the parties in the mining and milling of uranium ore in the Ambrosia Lake region of New Mexico.
 
 
 2
 Mid-Continent Exploration Company, the lessee of an area herein referred to as Section 11, entered into an agreement with Dunn Brothers for the operation of the leases by Dunn Brothers. Rio de Oro Uranium Mines, herein referred to as Rio, succeeded to the rights and obligations of Dunn Brothers.
 
 
 3
 J. H. Whitney & Co., White, Weld & Co., San Jacinto Petroleum Corp., and United Western Minerals Company[1] held undivided fractional interests[2] in an area known as Section 32.
 
 
 4
 The production, processing and sale of uranium and uranium ore are controlled by the Atomic Energy Act of 1954, as amended.[3] After removal from its place of deposit in nature, uranium ore may be disposed of only to a licensee of the Atomic Energy Commission, herein referred to as the AEC.[4] The only market for uranium is the AEC which is authorized to establish guaranteed prices therefor.[5]
 
 
 5
 In 1956, Rio and the United Western Group sought a market for ore produced from Sections 11 and 32. In cooperation with Clyde Osborn they made a proposal to the AEC which contemplated the construction of a mill where their ore might be processed and the product sold to the AEC as uranium concentrate. The financing of such a venture presented difficulties which were overcome by the willingness of Homestake Mining Company to participate in the enterprise.
 
 
 6
 On September 21, 1956, Homestake, Rio, the members of the United Western Group and Osborn entered into a limited partnership agreement under New Mexico law. Homestake is the general partner and the others are limited partners. Such limited partnership, known as Homestake-New Mexico Partners and herein referred to as New Mexico Partners, made a contract with the AEC whereby New Mexico Partners was licensed to construct a mill in the Ambrosia Lake area to process uranium ore and to engage in other activities incident thereto. The contract terminates March 31, 1962. The mill has a capacity of 750 tons daily, of which 20% is set apart for custom ore, i. e., ore in which neither the partnership nor any of its members holds an economic interest. The mill has been in operation since February 3, 1958.
 
 
 7
 On December 6, 1956, without the express consent or approval of the other members of New Mexico Partners, Homestake entered into a limited partnership agreement with Sabre-Pinon Corporation. In this partnership, herein referred to as Sapin, Homestake is the general partner and Sabre-Pinon the limited partner. The Sapin partnership agreement contemplated a contract with the AEC, the mining of ore by Homestake on lands of Sabre-Pinon, and the processing of that ore in a mill to be constructed by Homestake. The necessary AEC contract was secured and a mill with a capacity of 1,500 tons daily was constructed near the mill of New Mexico Partners and has since been in operation. In the financing, construction, and early operation of the Sapin mill, Homestake used assets and facilities of New Mexico Partners without the knowledge of the limited partners.
 
 
 8
 From these basic facts controversies arose which culminated in two lawsuits brought in the United States District Court for the District of New Mexico. In each case jurisdiction was predicated on diversity. The two cases were consolidated for trial but separate judgments were entered.
 
 
 9
 Appeal No. 6203 involves the first of those cases. It was brought by Mid-Continent against Homestake and New Mexico Partners to obtain a declaration of the rights of the parties to Section 11 ore and to secure incidental relief. Mid-Continent prevailed below. Homestake and New Mexico Partners have appealed.
 
 
 10
 Appeals Nos. 6244-6247 arise out of the second case, which was filed by Rio against Homestake. Three basic claims are asserted. The first relates to the respective rights of the parties to Section 11 ore. The second charges Homestake with the breach of fiducial duties and seeks the imposition of a constructive trust. The third is for an accounting because of the breach of fiducial duties.
 
 
 11
 The members of United Western Group intervened in the second case as plaintiffs and filed a cross-claim against Rio asserting the dedication of Section 11 ore by Rio to New Mexico Partners. Osborn entered an appearance submitting to the jurisdiction of the court. The suit resulted in a judgment in favor of Rio as to the Section 11 ore issue; a finding that Homestake had breached its fiducial duties but the denial of a constructive trust on the ground that the complaining parties had been guilty of laches; an order requiring Homestake to make money payments to New Mexico Partners for the use of assets and facilities of New Mexico Partners in the furtherance of the Sapin partnership; protective orders to assure the independent operation of New Mexico Partners; the denial of an accounting; and the retention of jurisdiction to determine at a later date the question of damages and the sufficiency of a contractual accounting.[6]
 
 
 12
 Nos. 6244 and 6245 are appeals by Rio and the members of the Farmout Group, respectively. They assert that the trial court erred in sustaining the defense of laches and denying the imposition of a constructive trust.
 
 
 13
 No. 6246 is an appeal by United Western which contends that the judgment is wrong in the disposition of the Section 11 ore issue and in the denial of the constructive trust because of laches.
 
 
 14
 No. 6247 is an appeal by Homestake which complains of the judgment in so far as it relates to the Section 11 ore dispute and to that part of the judgment requiring the milling of custom ore at the mill of New Mexico Partners.
 
 
 15
 The question of the respective rights of the parties to Section 11 ore is common to Nos. 6203, 6246, and 6247. Homestake, New Mexico Partners, and United Western claim that this ore was contributed to New Mexico Partners as capital of that partnership and may be disposed of only to New Mexico Partners and processed only in the mill of that partnership. Mid-Continent and Rio deny that such ore went to New Mexico Partners as a capital contribution, concede that the ore is committed to New Mexico Partners to the extent of the capacity of the mill allocated or allocable to Section 11 ore, and assert that Section 11 ore in excess of the amount that can be milled by New Mexico Partners may be disposed of to other mills. The trial court held that Section 11 ore did not go to New Mexico Partners as a capital contribution and permitted the disposition of the ore elsewhere under conditions which will be later noted. The consideration of the Section 11 ore issue requires a more detailed study of the facts than heretofore presented.
 
 
 16
 By two separate instruments, Stella Dysart leased to Mid-Continent substantially all of the South Half of Section 11 for a term of 5 years commencing February 1, 1955, and "as long thereafter as mining operations are diligently pursued and as long as uranium or other minerals are produced in commercial quantities." These leases granted to Mid-Continent the exclusive right to develop, mine, mill, and market minerals and ores from the demised premises. Mid-Continent was required to mine diligently and properly and to pay Dysart a royalty of 17½% on all ores sold. This royalty was not payable in kind. The leases could not be assigned without the written consent of Dysart.
 
 
 17
 On May 3, 1955, Mid-Continent entered into an operating agreement with Dunn Brothers covering the leased land. Dunn agreed to mine the ore from Section 11 at its own expense with reimbursement only out of production. The proceeds from the sale of the ore, after deduction of the expenses of Dunn, were to be split equally between Dunn and Mid-Continent. The agreement provides that "the greatest possible economic speed shall be used in exploiting the minerals discovered." Paragraph 10 authorizes Dunn to "arrange for the marketing of all minerals produced." Paragraph 12 provides that the minerals produced "shall not be subject to sale by either of the parties hereto acting alone, but shall be sold * * * by both parties."
 
 
 18
 With the written consent of Dysart and Mid-Continent, Dunn made two assignments of the operating agreement with the result that Rio succeeded to the operating rights and obligations of Dunn.[7] Rio obtained commercial production of uranium ore on the Dysart land.
 
 
 19
 As previously mentioned, Rio needed milling facilities in order to market Section 11 ore and the United Western Group needed similar facilities for Section 32 ore. These needs were responsible for the formation of New Mexico Partners with Homestake as the general partner.[8]
 
 
 20
 The members of the United Western Group contributed to New Mexico Partners "their respective interests in Section 32." The provision for contribution by Rio, in so far as material, reads:
 
 
 21
 "Rio hereby contributes to the Partnership all of its rights with respect to the uranium and other ores mined from [Section 11] * * after July 1, 1956, and hereby contributes such ores to the Partnership for the purpose of facilitating the construction and financing of the Mill, * * *."
 
 
 22
 The capacity of the mill remaining after the deduction of the 20% allocated to custom ore is divided equally between Section 11 and Section 32 ore, except that Homestake can utilize capacity up to 150 tons per day for ore "from whatever source it chooses." If such capacity is used by Homestake, the allocable capacity of Rio is accordingly reduced, but Rio can require New Mexico Partners to stockpile Section 11 ore and advance 75% of the AEC price for such stockpiled ore.
 
 
 23
 The profits of the mill are divided on formulas which vary in accordance with the type of ore processed. The United Western Group has no rights in profits from the milling of Section 11 ore and Rio receives no profits from the milling of Section 32 ore. On ore delivered by Homestake the profits are divided only between Homestake and Osborn. All the partners participate in the profits arising from the milling of custom ore. Section 32 ore is mined by New Mexico Partners but Section 11 ore is mined by Rio.
 
 
 24
 Upon the dissolution of the partnership, Section 32 "shall be conveyed to members of the United-Western Group" and "the dedication of ore reserves in Section 11 shall be released to Rio."
 
 
 25
 Ore is being mined from Section 11 at the rate of approximately 30,000 tons per month. Mills other than that of New Mexico Partners are now available in the area for the processing of that ore.
 
 
 26
 The first question is whether Rio had the right to contribute, unilaterally, Section 11 ore to New Mexico Partners as capital of that partnership.
 
 
 27
 By the Dysart leases, title to Section 11 ore passed to Mid-Continent[9] and it remains in Mid-Continent unless transferred by the Dunn agreement. There is no express transfer of title in that agreement. Homestake and New Mexico Partners rely on Paragraph 10 thereof which provides that Dunn [Rio] will arrange for the marketing of Section 11 ore and will be reimbursed for expenses out of ore produced. Mid-Continent relies on Paragraph 12 which says that the ore shall not be sold by either party acting alone but shall be sold by both parties acting together at the best price obtainable, and, after the payment of the operational expense, the profits shall be divided equally.
 
 
 28
 All provisions of the agreement must be construed together and given effect if possible.[10] Applying this rule, the conclusion is justified that Paragraph 10 gives Rio the right to arrange for the marketing of the ore and that Paragraph 12 requires the actual sale to be made by the joint action of Rio and Mid-Continent. Indeed, this was the conclusion of the attorneys for Homestake who, according to an exhibit in the record, advised their client that "Paragraph 12 would control so far as the sale of ore is concerned."
 
 
 29
 Language employed in the limited partnership agreement negates the claim of a contribution of the ore as a capital asset of the partnership. With respect to Section 32 ore, the United Western Group contributed "their respective interests in Section 32" and the agreement provides that upon dissolution of the partnership Section 32 "shall be conveyed to the members of the United-Western Group." A different treatment was given Section 11. The contract provides that Rio contributes "all of its rights" with respect to Section 11 ore and upon dissolution "the dedication of ore reserves in Section 11 shall be released to Rio." Further, Paragraph 7(e) (5) provides that New Mexico Partners may acquire a lien upon stockpiled Section 11 ore in the event it makes certain advances to Rio. The recognition of a possible lien is inconsistent with a claim of ownership. We conclude that Rio could not dispose of any Section 11 ore to New Mexico Partners without the consent or approval of Mid-Continent and did not make a capital contribution of that ore to the partnership.
 
 
 30
 In 1956, the desirability of having a mill in the Ambrosia Lake area at which Section 11 ore could be processed was apparent. It was to the advantage of Dysart, Mid-Continent and Rio to obtain such a mill. The efforts which were made by Rio to secure a mill were known to Mid-Continent but some of the Mid-Continent officers and stockholders objected to an arrangement whereby Rio would participate in the profits from milling operations.
 
 
 31
 Prior to the negotiations with Homestake which culminated in the creation of New Mexico Partners, Rio and the United Western Group attempted to interest Foley Brothers in a similar enterprise. In connection with the dealings with Foley Brothers, the president of Mid-Continent wrote a letter to Rio, dated February 8, 1956, in which he said that Rio was authorized to "pledge the full 100% of Mid-Continent's ore produced" from Section 11 to a mill in which Rio should have part ownership "at a price for said ore not less than the standard posted price set out by the Atomic Energy Commission." This letter was used by Rio in its transactions with those who formed New Mexico Partners as indicative of its rights in regard to Section 11 ore.[11]
 
 
 32
 At the time of the execution of the agreement creating New Mexico Partners, Homestake and the limited partners made another agreement which permitted Homestake to terminate the partnership agreement by giving a required notice within a fixed time if Homestake was not satisfied with the titles of the parties and their right to make their agreed contributions to the partnership. Before the expiration of the allowed period the stockholders of Mid-Continent, at a special meeting held on November 24, 1956, considered the participation by Rio in New Mexico Partners and adopted a resolution which reads:
 
 
 33
 "* * * the dedication of the production of uranium bearing ores from [Section 11] * * * through Rio De Oro Uranium Mines, Inc., in their participation in Homestake-New Mexico Partners, be and the same is hereby confirmed and ratified in all respects."
 
 
 34
 Subsequently, the members of New Mexico Partners executed a certificate making the limited partnership effective.
 
 
 35
 The pertinent query is the effect of these actions by Mid-Continent. Difficult as it may be to comprehend the inability of people dealing with the property values here involved to express themselves with clarity, we must accept the situation as presented and determine the respective rights. Considering first the February 8 letter, the commitment there intended was dependent upon the payment of AEC prices.
 
 
 36
 Paragraph 8(c) (iii) of the agreement creating New Mexico Partners provides that Rio shall receive 72.75% of the mill profits on Section 11 ore, less $1.52 per ton for each ton of Section 11 ore contributed by Rio, plus the AEC price for such ore, provided that the $1.52 per ton shall not be payable to Homestake after 6,300,000 pounds of U3O8 shall have been delivered by the partnership to the AEC. The meaning of this involved provision is not clarified in the record.[12] We need concern ourselves no further with the mystery than to say that payment of AEC prices less $1.52 per ton is not the payment of AEC prices and, hence, does not satisfy the condition imposed by the February 8 letter.
 
 
 37
 The November 24 resolution of the Mid-Continent stockholders is not a complete answer to the problem.[13] That resolution approves the dedication of Section 11 ore made by Rio in its participation in the partnership. The partnership agreement had been previously executed and therein Rio had contributed its "rights" in Section 11 ore. It had not purported to contribute anything belonging to Mid-Continent.
 
 
 38
 Be that as it may, the entire situation must be considered. This includes the Dysart leases, the Dunn agreement, the limited partnership agreement, the New Mexico Partners-AEC agreement, the amount of production from Section 11, and the mill capacity available for processing Section 11 ore. The available capacity ranged from a firm minimum of 150 tons daily to an uncertain maximum of 750 tons daily. The production from Section 11, which the court held resulted from operations conducted "in a good and minerlike fashion," amounted to approximately 30,000 tons a month or 1,000 tons a day. The AEC contract requires that 20% of mill capacity be allocated to custom ore. Both the AEC contract and the limited partnership agreement contemplate that the cost of the mill shall be paid out of the amortization allowance provided in the AEC contract.[14] The provisions of the limited partnership agreement obligating New Mexico Partners to take Section 11 ore are subject to complex qualifications and limitations which need not be detailed. The Dunn agreement requires the operator, Rio, to proceed with the greatest possible economic speed in exploiting the minerals found in Section 11. The Dysart leases obligate Mid-Continent to carry on mining operations diligently and so long as ore can be commercially produced. All of these factors must be weighed with the advantage resulting to Dysart, Mid-Continent and Rio from the construction of a mill where the ore could be marketed. At the same time, it must be recognized that the financial risk inherent in the enterprise would not be assumed by a reasonable man without satisfactory assurance of the availability of ore for processing. This risk was well known to all parties.
 
 
 39
 From the entire situation it is a rational conclusion that Mid-Continent acquiesced in the dedication by Rio to New Mexico Partners of Section 11 ore to the capacity of the mill during the life of the AEC contract on the basis that AEC prices would be paid for the ore. The lower court, as the trier of the facts, so concluded on the basis of findings which are not clearly erroneous and on inferences which are reasonable. We may not substitute our inferences for those of the trial court.[15]
 
 
 40
 Homestake and New Mexico Partners assert that Mid-Continent is barred from contending that Rio had no right to contribute the Section 11 ore to New Mexico Partners. The argument is not persuasive. On conflicting evidence, from which conflicting inferences can be drawn, the court made findings in favor of Mid-Continent. In such a situation a choice between two permissible views is not clearly erroneous.[16]
 
 
 41
 Laches is also raised as a defense against the action by Mid-Continent. On conflicting evidence the trial court found that Mid-Continent did not know or have reason to know until April, 1958, that Homestake and New Mexico Partners claimed that Section 11 ore was contributed as capital to the partnership and could be disposed of only through the partnership. The court also found that immediately thereafter Mid-Continent notified Homestake and New Mexico Partners of its contrary position and promptly, on June 12, 1958, instituted its action. The question of laches is ordinarily for the trial court.[17] There is ample support for the conclusion of the trial court. The denial of the defense of laches must be sustained.
 
 
 42
 Next we meet the claim of Homestake and New Mexico Partners that Rio is an indispensable party-plaintiff and that the joinder of Rio as a plaintiff destroys diversity jurisdiction because Rio and the partners United Western and San Jacinto are all Delaware corporations.[18] Reliance is placed on the rule that a party is indispensable when he has such an interest that a decree may not be entered without leaving the controversy in such a condition that its final determination would not be consistent with equity and good conscience.[19] However, this rule is applied on the basis of practical considerations.[20] Here we have the consolidation for trial of the Mid-Continent-Homestake suit with the Rio-Homestake suit. In each the issue is raised as to the respective rights of the parties to Section 11 ore. No one disputes the fact that, although a separate judgment was entered in each case, the consolidated actions raised every question affecting the rights of every party. The various controversies are not left so that the final determination of either is inconsistent with equity and good conscience.
 
 
 43
 This conclusion requires consistency between the provisions of the two judgments relating to Section 11 ore. Under the Dunn agreement, Rio mines the Section 11 ore and Rio and Mid-Continent, acting together, sell that ore. In the Mid-Continent case the judgment provides that Mid-Continent has the right to sell, to persons other than New Mexico Partners, Section 11 ore in excess of that quantity which New Mexico Partners obligates itself to take in accordance with delivery schedules which it may establish and which may call for such ore to the full extent of the capacity of the mill.
 
 
 44
 Paragraph 7 of the judgment in the Rio case reads thus:
 
 
 45
 "Plaintiff [Rio] has the right to sell and deliver to others than Homestake-New Mexico Partners such part of the production from Section 11 as shall be in excess of the quantities required to make deliveries in accordance with paragraphs 4 and 5 hereof. The permission to sell to others than Homestake-New Mexico Partners is subject to the condition that Plaintiff shall keep in reserve, either in stockpile at the mine or underground in the mine itself, a quantity of ore deemed by Plaintiff to be sufficient to contribute its pro rata share of ore necessary to fulfill and meet the commitments made in the contract with the Atomic Energy Commission. In the event question, controversy or dispute shall arise as to the quantity of ore kept in reserve the Court shall appoint a qualified person to inspect such reserve supply of ore and determine whether it is or will be adequate to meet the commitments in the Atomic Energy Commission contract. Such person shall report his findings to the Court, who shall make and enter any orders it may then determine to be requisite."
 
 
 46
 Thus, the right to sell to others is recognized in the Mid-Continent judgment and is not limited by any requirement to maintain any reserve of unmined or stockpiled ore in a quantity adequate to meet the commitments of the AEC contract, although such requirement is imposed on Rio by the judgment in the Rio-Homestake suit. The need for the requirement is the same in each instance. The judgment in the Mid-Continent suit should be modified so that the right of Mid-Continent to sell Section 11 ore to others than New Mexico Partners is subject to the requirement that, during the life of the New Mexico Partners-AEC contract, Mid-Continent shall permit and require Rio to maintain, either in stockpile or in unmined ore reserves, a quantity of uranium ore sufficient to satisfy the capacity of the New Mexico Partners mill allocated to that ore under conditions and restrictions the same as those imposed on Rio by Paragraph 7 of the judgment in the Rio-Homestake suit. Except for this modification of the judgment in the Mid-Continent suit the judgments relative to the respective rights of the parties to Section 11 ore are affirmed.
 
 
 47
 The remaining issues arise out of the Rio-Homestake case and pertain primarily to the alleged breaches by Homestake of its fiducial obligations to the other members of New Mexico Partners. These breaches are based on the improper use by Homestake of the assets and facilities of New Mexico Partners, both in connection with the construction and operation of the Sapin mill and in the conduct of certain exploratory work, the acquisition by Homestake for itself of the business opportunity afforded by the situation which resulted in the formation of Sapin, and the acquisition by Homestake for its own account, rather than the account of New Mexico Partners, of certain New Mexico uranium properties. Because of these breaches of fiducial duties, Rio and the United Western Group insist that a constructive trust, for the benefit of New Mexico Partners, must be imposed on the profits accruing to Homestake from the Sapin venture.
 
 
 48
 The trial court made specific orders relating to the use of the assets and facilities of New Mexico Partners and to the conduct of the affairs of that partnership. Homestake has complied and does not now object to such orders.[21]
 
 
 49
 The agreement creating New Mexico Partners provides that it shall be governed by New Mexico law. That state has adopted both the Uniform Partnership Act and the Uniform Limited Partnership Act.[22] Under the act pertaining to limited partnerships, the general partner has all the rights and powers and is subject to all the restrictions and liabilities of a partner in a partnership without limited partners[23] and, hence, is accountable to the other partners as a fiduciary.[24]
 
 
 50
 While this agreement is denominated as "Limited Partnership Agreement," its provisions are such that it may more accurately be described as a contract setting up several joint adventures by Homestake — one with Rio, one with United Western Group, one with Osborn, and one in which all participate.[25] The distinction is unimportant as the relationship created by a joint adventure is fiduciary in character and requires the utmost good faith on the part of all parties thereto.[26]
 
 
 51
 Aside from the breaches by Homestake arising from the improper use of assets and facilities of New Mexico Partners, the principal claim of faithlessness on the part of Homestake relates to the acquisition by Homestake, for its own benefit and to the exclusion of the other members of the New Mexico Partners, of the business opportunity which culminated in the creation of Sapin. In the formation of New Mexico Partners the participants, beyond question, considered the advantages which would accrue from the ownership and operation of the first mill in the Ambrosia Lake area for the processing of uranium ore and they undoubtedly contemplated the possible enlargement of that mill. Nevertheless, their respective rights and liabilities are determined by the agreement which they voluntarily made and it is presumed that they delegated all the powers which they wished to confer and withheld all power or authority not affirmatively delegated.[27]
 
 
 52
 Homestake was in the mining business. Its agreement with the other members of New Mexico Partners did not forbid it to enter into similar enterprises with others. After considering the agreement and hearing the evidence of the parties as to their intent, the trial court concluded that the obligation of Homestake to devote its skill, knowledge and services to New Mexico Partners was not exclusive and that Homestake had the right to participate in similar ventures to the extent that there was no conflict of interest. This conclusion is supported by the record.
 
 
 53
 Certain aspects of the transaction between Homestake and Sabre-Pinon must be mentioned. The ore on the Sabre-Pinon properties was "wet ore" which presented mining difficulties and made the enterprise hazardous and speculative. Before making its arrangements with Homestake, Sabre-Pinon had endeavored to interest other experienced and competent mining firms in the venture but they had all rejected it because of the mining risks involved. Homestake, through its skill and experience, had developed a successful method of mining Section 32 ore, which presented a similar problem, and was willing to undertake the risk. Additionally, the Sapin venture required substantial financing — a total of $17,000,000 for mill construction, mining development and working capital.
 
 
 54
 Participation in the Sapin venture was not essential to the operations of New Mexico Partners. It had available from its own resources adequate reserves of ore to keep its mill in operation during the duration of the AEC contract. The activities of New Mexico Partners were defined and limited in scope and could not be enlarged by the unilateral action of Homestake. There is no showing that New Mexico Partners had the financial ability to enter into the venture. Indeed, all the evidence is to the contrary as the New Mexico Partners venture was dependent upon financing by Homestake.
 
 
 55
 Accepting the rule that a person having a fiduciary obligation to another may not take for himself a business opportunity which in fairness and honesty he should take for or share with another,[28] a review of the many cases involving this principle is of little use as the decision in each is dependent upon the facts.[29] It suffices to say that to justify equitable relief, such as the imposition of a constructive trust, there must be convincing evidence of a conflict of interest and of an unfair advantage taken of those deprived of participation.[30] As New Mexico Partners had adequate ore reserves, the competition or conflict of interest between it and Sapin could arise only in so far as custom ore was concerned and the record established that there was sufficient custom ore in the area to satisfy the capacity of the New Mexico Partners mill allocated to such ore. We need not concern ourselves here with the situation which may exist after the termination of the AEC contracts and the possible development of a free market.
 
 
 56
 There are impediments to granting equitable relief in the nature of a constructive trust. Rio and the United Western Group assert that the profits received by Homestake from the Sapin venture should go to New Mexico Partners and be divided on the basis of the formula for distribution of assets, excluding contributed assets, at the time of the dissolution of that partnership. This would require a judicial rewriting of the New Mexico Partners agreement. Therein particular provisions are made for the distribution of profits arising from the processing of ore. Sapin ore is not custom ore as Homestake has an economic interest therein and it is not ore contributed by either Rio or the United Western Group. It falls into the category of ore contributed by Homestake and the profits arising from the processing of such ore are divided only between Homestake and Osborn, who is not here complaining.
 
 
 57
 Moreover, we have serious doubt as to the applicability of relief in the form of a constructive trust applied to the profits arising from the speculative Sapin enterprise. In cases involving speculative ventures courts have generally declined to impose a constructive trust.[31]
 
 
 58
 The imposition of a constructive trust is an equitable remedy requiring the balancing of equities. Homestake was considerably less than frank in dealing with its associates in New Mexico Partners in so far as the Sapin transaction was concerned. It refused to keep them fully advised and it is a reasonable inference that it concealed from them the true nature of its negotiations. Without notice to its partners, it utilized assets and facilities of the partnership for the new venture and it entered into the new venture with both it and the old venture under the same management.
 
 
 59
 At the same time, Rio and the United Western Group are not free from fault. They knew that Homestake was dealing with Sabre-Pinon. The construction of the Sapin mill was obvious to all. Yet they did nothing to claim the right of participation in the venture. Their reasons for inaction are obscure but it is a reasonable inference that the mining hazard was a strong deterrent. Instead of asserting any claimed right, they waited until the enterprise was successful and then swarmed in to recover the windfall which their associate made possible by its skill, ingenuity and daring. Faithless as Homestake may have been, it is not our prerogative to rewrite the New Mexico Partners agreement so as to bring the Sapin enterprise within its purview and thus reward the limited partners with a share of the profits arising from efforts in which they did not participate.
 
 
 60
 The imposition of a constructive trust on the profits accruing to Homestake under the speculative Sapin venture would punish Homestake and create a gratuitous windfall for its complaining associates. This is not the purpose of a constructive trust. It is a remedial device employed to accomplish equity. In a mining case, decisions bearing on the availability of a constructive trust as a remedy for protection from deviating fiduciaries in common business undertakings are of little value as precedents. It is not equity, but injustice, to permit a person to withhold a claim to a mining enterprise and then to reward him with the profits made possible by the action of another.[32] There is no class of cases in which the doctrine of laches has been more relentlessly enforced.[33]
 
 
 61
 The reasons advanced against the applicability of laches as a defense are not persuasive. These relate to lack of knowledge of the Sapin business opportunity, non-reliance by Homestake on any action or non-action by the complaining partners, and ignorance by such partners of misuse of partnership assets and facilities. As to the first and second points, the record does not sustain the contentions. Rio and the United Western Group had knowledge of the negotiations between Homestake and Sabre-Pinon and entered no protest to that transaction. Instead they silently stood by and permitted Homestake to undertake a commitment requiring the expenditure of $17,000,000 for mill construction, mining development and working capital. There were both knowledge and duty to assert claims. Failure to assert a claim when duty so requires is a recognized ground for laches.[34]
 
 
 62
 The third point is in a different category. Homestake used the assets and facilities of New Mexico Partners for its own benefit and for the benefit of Sapin. It is no answer to say that joint use of the facilities was more efficient and economical. However, when viewed in the magnitude of these enterprises this misconduct fades into comparative insignificance. Laches is a creature of equity and each situation must be examined in the light of its own particular facts.[35] The trial court deemed that reimbursement, protection against unit control, and assurance of compliance with the partnership agreement, all coupled with retention of jurisdiction to assess damages and require an accounting, provided sufficient relief, and denied a constructive trust on the ground that the complaining limited partners were guilty of laches. This conclusion is based on findings well supported by substantial evidence. It is a fair and just determination of the issue. The wrongful acts of Homestake arising from the misuse of assets and facilities entrusted to its care does not entitle either Rio or the United Western Group to receive profits from a multi-million dollar venture in which they risked nothing.
 
 
 63
 In addition to its entry into the Sapin enterprise, Homestake, after the creation of New Mexico Partners, acquired either for itself or for wholly owned subsidiaries New Mexico uranium properties and in so doing used facilities of New Mexico Partners. Rio and the United Western Group complain that such properties should have been acquired for the account of New Mexico Partners.
 
 
 64
 This dispute involves an interpretation of the New Mexico Partners agreement. Paragraph 11(b) thereof provides, in substance, that without the consent of all partners Homestake shall not purchase or acquire new mining properties or leases. Paragraphs 7(e) (5) and 7(e) (8) expressly recognize the right of Homestake to contribute ore to the partnership and Paragraph 8(d) says that on ores delivered to the partnership by Homestake the profits shall be divided 97% to Homestake and 3% to Osborn. The court below heard evidence as to the intent of the parties in connection with these contractual provisions and held that the limitation contained in Paragraph 11(b) restricts Homestake's actions as a general partner but does not restrict its actions in any other capacity. The conclusion is sound and must be upheld.
 
 
 65
 As previously noted, the lower court required certain actions to be taken by Homestake because of its use of the assets and facilities of New Mexico Partners in furtherance of the Sapin venture and in the acquisition of other uranium properties. Homestake has acceded to these orders. The matter of damages to New Mexico Partners, because of this conduct of Homestake, was expressly held for later determination and is not now before us. However, complaint is made of the failure of the court to require Homestake to make an accounting under court supervision. In this regard the court concluded that the accounting provisions of the New Mexico Partners agreement were adequate protection and ordered that if dissatisfaction resulted from such accounting the parties could return to the court and request further relief. We find nothing in the record to indicate that such actions of the court are anything but the wise and proper use of a discretionary power and we shall not disturb its decisions in regard thereto.
 
 
 66
 Homestake complains of Paragraph 1 (c) of the judgment in the Rio-Homestake case[36] which enjoins Homestake from diverting custom ore from the New Mexico Partners mill to the Sapin mill or to other mills. The difference between the parties here is that Rio and the United Western Group contend that New Mexico Partners has first call on all custom ore acquired by Homestake, whereas Homestake asserts the right to divert custom ore to Sapin and others. The effect of the attacked portion of the judgment is to prohibit the diversion of custom ore from the New Mexico Partners mill except upon the acquiescence of the limited partners.
 
 
 67
 The agreement creating New Mexico Partners allocates 20% of the mill capacity to custom ore, provides that the partnership shall finance the normal stockpiling of ore, gives Homestake authority to determine what is a normal stockpile, with the proviso that a minimum stockpile of 75,000 tons shall be maintained, and allocates the stockpile capacity available to Section 11, Section 32, and Homestake ore with no allocation for custom ore.
 
 
 68
 The AEC contract places the obligation on New Mexico Partners to purchase and process in its mill custom ore in an amount not more than 20% of the mill capacity during any calendar year and limits the purchase of such ore from any one customer to "5% of its [New Mexico Partners'] annual ore requirements." For the 750 ton mill, the 20% of annual capacity is approximately 60,000 tons and the 5% is 15,000 tons.
 
 
 69
 The findings of the trial court, in each instance sustained by the record, are that Homestake contracted with Calumet and Hecla, Inc., for the quarterly delivery of 3,400 tons of custom ore to the mill of New Mexico Partners and 16,600 tons of such ore to the mill of Sapin; that Homestake diverted to the Sapin mill custom ore which had been sampled and stockpiled at the New Mexico Partners mill; and that, after receiving advice from counsel that such diversion of custom ore was improper, Homestake made all custom ore contracts in the name of Sapin.
 
 
 70
 Paragraph 1(c) of the judgment in the Rio-Homestake case violates the New Mexico Partners agreement in that, even if concern is given only to the Calumet and Hecla custom ore contracts, the allocation of mill capacity to custom ore is increased and the allocation to Section 11 and Section 32 ore is decreased because the Calumet and Hecla contract calls for delivery of 80,000 tons annually or 20,000 tons more than the capacity allocated to custom ore. The acceptance at the New Mexico Partners mill of other custom ore would upset the allocations further.[37] Also, there would be a violation of the AEC contract provisions relating to the total annual capacity available for custom ore and limiting the purchases of such ore from any one ore producer.
 
 
 71
 Neither Homestake nor New Mexico Partners is under any obligation, contractual, fiducial or otherwise, to take custom ore in excess of the amounts fixed by the partnership agreement and the AEC contract. The judgment must be modified to recognize that New Mexico Partners has the first call on custom ore, contracted by Homestake for either that partnership, Sapin, or any other account, to the extent of the annual and individual limitations imposed by the AEC contract and in accordance with the provisions of the New Mexico Partners agreement.
 
 
 72
 Homestake directs attention to the unity of control over Mid-Continent and Rio. In 1957, the Hidden Splendor Mining Company, a wholly owned subsidiary of Atlas Corporation, acquired the ownership of approximately 60% of the stock of Rio and of all the stock of Mid-Continent, except the 21.8% of that stock held by Rio. On October 23, 1959, a certificate of the dissolution of Mid-Continent was filed with the Secretary of State of Texas, the state in which Mid-Continent was incorporated.
 
 
 73
 Homestake has moved for the substitution of Hidden Splendor for Mid-Continent. The applicable Texas statute[38] provides that upon the dissolution of a corporation its president and directors, for the purpose of settling its affairs, may, in the name of the corporation, maintain or defend judicial proceedings. The dissolution took place eight months after the entry of the judgment here involved. By the plain terms of the Texas statute the defense of this appeal may be maintained in the corporate name of the dissolved company. The motion for substitution is denied.
 
 
 74
 Homestake further contends that it is inequitable to permit Atlas to harass it by a suit brought by one of its controlled subsidiaries, Mid-Continent, denying rights based on a contract between that entity and another subsidiary, Rio. This pertains to the claim that Section 11 ore was dedicated to New Mexico Partners and that Mid-Continent now denies that dedication. The simple answer is afforded by the Homestake brief which asserts that the contractual rights as to Section 11 ore are to be determined as of the date of the agreement creating New Mexico Partners, i. e., September 21, 1956. Atlas, acting through Hidden Splendor, did not acquire control of Mid-Continent until 1957.
 
 
 75
 The claim of the Farmout Group that it should have judgment against Homestake for its costs and attorneys' fees is denied. Rule 54(d) of the F.R.Civ.P. provides that "* * * costs shall be allowed as of course to the prevailing party unless the court otherwise directs." The court directed that "each party to this action shall pay its own costs and expenses." Thus, even though the Farmout Group be considered the prevailing party, it has no grounds for complaint as the trial court exercised the discretion given it under Rule 54(d) and directed that each party should pay its own costs and expenses. The allowance of costs to the prevailing party is not a rigid rule[39] and is within the court's sound discretion.[40]
 
 The issues presented are disposed of thus:
 
 76
 1. The motion of Homestake to substitute Hidden Splendor for Mid-Continent as appellee in No. 6203 is denied.
 
 
 77
 2. In No. 6203 the judgment entered by the court below in its civil action No. 3889, the Mid-Continent-Homestake suit, is modified to obligate Mid-Continent, during the life of the AEC contract, i. e., until March 31, 1962, to permit and require Rio to maintain, either in stockpile or in unmined ore reserves, a quantity of Section 11 ore sufficient to satisfy the capacity of the New Mexico Partners mill allocated to that ore under conditions and restrictions the same as those imposed on Rio by Paragraph 7 of the judgment entered below in civil action No. 3893, the Rio-Homestake suit. Otherwise the judgment in No. 6203 is affirmed.
 
 
 78
 3. In Nos. 6244, 6245, 6246, and 6247 the judgment entered by the court below in its civil action No. 3893, the Rio-Homestake suit, is modified in so far as Paragraph 1 (c) is concerned to require Homestake to give preference on all custom ore acquisitions in which it participates to New Mexico Partners to the extent that such custom ore acquisitions are within the limitations imposed by the New Mexico Partners-AEC contract and in making such acquisitions to comply with the terms of the contract creating New Mexico Partners. Upon the satisfaction of these conditions Homestake shall be permitted to divert custom ore from New Mexico Partners and to acquire such ore for others than New Mexico Partners. Otherwise the judgment involved in appeals Nos. 6244-6247, inclusive, is affirmed.
 
 
 79
 4. In this court each party shall bear its own costs.
 
 
 
 Notes:
 
 
 [1]
 These four parties will be referred to collectively as the United Western Group. When reference is made only to the first three parties and to the exclusion of United Western Minerals Company, they will be referred to as the Farmout Group
 
 
 [2]
 The nature of such interests does not clearly appear in the record and is not of importance herein
 
 
 [3]
 42 U.S.C.A. §§ 2011-2281
 
 
 [4]
 42 U.S.C.A. § 2092. Uranium and uranium ore are within the definition of "source material" contained in 42 U.S. C.A. § 2014(x)
 
 
 [5]
 42 U.S.C.A. § 2096
 
 
 [6]
 No question is presented as to the finality of the judgment in the Rio-Homestake case as there was compliance with Rule 54(b), F.R.Civ.P., 28 U.S.C.A
 
 
 [7]
 The first assignment was of a 20% interest to one Anderson who thereafter assigned to the Hidden Splendor Mining Company. This assignment is not important to the determination of the issues presented
 
 
 [8]
 Osborn was included because of his interest in a proposal made by him, Rio and the United Western Group to the AEC. The only contribution of Osborn to the New Mexico Partners was $1,000 and his interest in the mentioned proposal
 
 
 [9]
 Duvall v. Stone, 54 N.M. 27, 213 P.2d 212, 215
 
 
 [10]
 Moyer v. Walker, 10 Cir., 276 F.2d 681, 683; Frankfort Oil Company v. Snakard, 10 Cir., 279 F.2d 436
 
 
 [11]
 There was another letter from the president of Mid-Continent to Rio, dated February 11, 1956, relating specifically to ore mined from the SW¼, Section 11. The materiality of this letter is not apparent
 
 
 [12]
 The brief of Homestake in No. 6247 refers to the $1.52 figure as Homestake's "pre-computed profits of $1.52 per ton."
 
 
 [13]
 Mid-Continent makes technical objections to the legality of the stockholders' meeting and to the legal effect of the action there taken. We deem it unnecessary to consider these technical points which are seriously debatable. For our purposes, we consider the resolution as expressive of the policy and intent of that company
 
 
 [14]
 The AEC contract requires the AEC to purchase 6,300,000 pounds of U3O8 during the life of the contract which expires March 31, 1962. It further provides for the payment by the AEC of eighty-eight cents for each pound of U3O8 up to the amount of $5,325,000 to pay for the cost of the mill.
 
 
 [15]
 Timken Roller Bearing Co. v. United States, 341 U.S. 593, 596-597, 71 S.Ct. 971, 95 L.Ed. 1199; Friedman v. Sealy, Incorporated, 10 Cir., 274 F.2d 255, 260; Wunderlich Contracting Company v. United States, 10 Cir., 240 F.2d 201, 203, certiorari denied 353 U.S. 950, 77 S.Ct. 861, 1 L.Ed.2d 859
 
 
 [16]
 Cf. United States v. Yellow Cab Co., 338 U.S. 338, 342, 70 S.Ct. 177, 94 L. Ed. 150
 
 
 [17]
 Bergeson v. Life Insurance Corporation of America, 10 Cir., 265 F.2d 227, 231, certiorari denied 360 U.S. 932, 79 S.Ct. 1452, 3 L.Ed.2d 1545
 
 
 [18]
 In the Rio-Homestake case the claim is made that Mid-Continent is an indispensable party, but in that case joinder would not destroy jurisdiction. The disposition made of the question of indispensability in the Mid-Continent case is also applicable in the Rio case
 
 
 [19]
 Williams v. Pacific Royalty Company, 10 Cir., 247 F.2d 672, 675
 
 
 [20]
 Shaughnessy v. Pedreiro, 349 U.S. 48, 54, 75 S.Ct. 591, 99 L.Ed. 868; Choctaw and Chickasaw Nations v. Seitz, 10 Cir., 193 F.2d 456, 461, certiorari denied 343 U.S. 919, 72 S.Ct. 676, 96 L.Ed. 1332
 
 
 [21]
 These orders included, among other things: the payment by Homestake to New Mexico Partners of $84,945.05 as finance charges in connection with the financing of the New Mexico Partners and the Sapin mills which were improperly charged to New Mexico Partners; the payment by Homestake of $200 to New Mexico Partners for use of its water facilities in connection with the Sapin mill; the appointment by Homestake of a general manager for New Mexico Partners who would devote himself exclusively to the affairs of that partnership; the complete separation of the clerical, bookkeeping, auditing, and accounting operations of New Mexico Partners and Sapin; and the acceptance at the New Mexico Partners mill of all custom ore offered up to the amount of the AEC allocation rather than the diversion of such ore to Sapin
 
 
 [22]
 N.M.S.A. §§ 66-1-1 to 66-1-43 and 66-2-1 to 66-2-30 (1953)
 
 
 [23]
 Ibid. § 66-2-9
 
 
 [24]
 Ibid. § 66-1-21
 
 
 [25]
 The only portion of the enterprise in which all participate in the profits is that relating to the milling of custom ore
 
 
 [26]
 Frankfort Oil Company v. Snakard, supra
 
 
 [27]
 Frankfort Oil Company v. Snakard, supra, and cases cited in notes 19 and 20, 279 F.2d at page 443
 
 
 [28]
 Cf. Latta v. Kilbourn, 150 U.S. 524, 549, 14 S.Ct. 201, 37 L.Ed. 1169; Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 546-547, 62 A.L.R. 1
 
 
 [29]
 Cf. Johnston v. Greene, Sup.Ct.Del., 121 A.2d 919, 923
 
 
 [30]
 Cf. White v. Mayo, 35 N.M. 430, 299 P. 1068, 1071; Wright v. Holloway, 37 N.M. 168, 20 P.2d 274-275; New Mexico Potash & Chemical Co. v. Independent Potash & Chemical Co., 10 Cir., 115 F. 2d 544, 547
 
 
 [31]
 Turner v. American Metal Co., 268 App. Div. 239, 50 N.Y.S.2d 800, 814
 
 
 [32]
 Twin-Lick Oil Company v. Marbury, 91 U.S. 587, 592-593, 23 L.Ed. 328; Sunny Brook Zinc & Lead Co. v. Metzler, D.C.S.D.N.Y.1916, 231 F. 304, 311, affirmed 2 Cir., 238 F. 1007
 
 
 [33]
 Patterson v. Hewitt, 195 U.S. 309, 321, 25 S.Ct. 35, 49 L.Ed. 214
 
 
 [34]
 Pfister v. Cow Gulch Oil Co., 10 Cir., 189 F.2d 311, 315, certiorari denied 342 U.S. 887, 72 S.Ct. 177, 96 L.Ed. 665
 
 
 [35]
 Hunt v. Pick, 10 Cir., 240 F.2d 782, 785; Bechler v. Kaye, 10 Cir., 222 F.2d 216, 219, certiorari denied 350 U.S. 837, 76 S.Ct. 75, 100 L.Ed. 747
 
 
 [36]
 This paragraph enjoins Homestake from "[p]rocessing in the mill of Homestake Sapin Partners, or disposing of to any one other than Homestake-New Mexico Partners any custom ore acquired or hereafter to be acquired pursuant to contracts heretofore entered into by Defendant [Homestake], whether on behalf of Homestake-New Mexico Partners or Homestake-Sapin Partners, unless Plaintiff and Intervenors [Rio and United Western Group] shall consent in writing thereto."
 
 
 [37]
 The record shows that the 75,000 ton stockpile was maintained; that New Mexico Partners was purchasing and processing 7,000-11,000 tons of custom ore monthly; and that Sapin was similarly taking 10,000-13,000 tons of such ore monthly. If all this ore must be processed or stockpiled and processed by New Mexico Partners it would amount to 204,000-288,000 tons annually
 
 
 [38]
 Vernon's Ann.Civ.St., art. 1388. The Texas Business Corporation Act, adopted September 6, 1955, is not applicable inasmuch as the Act provides that it shall not become effective as to domestic corporations which were in existence at the time the Act was adopted until such time as the corporation should so elect or until five years from the effective date of the Act. Mid-Continent did not so elect and the five-year period does not expire until September 5, 1960. V.A.T.S. Bus. Corp.Act, art. 9.14
 
 
 [39]
 Fishgold v. Sullivan Drydock & Repair Corp., 328 U.S. 275, 284, 66 S.Ct. 1105, 90 L.Ed. 1230
 
 
 [40]
 Crutcher v. Joyce, 10 Cir., 146 F.2d 518, 520